Opinion by Judge PREGERSON; Dissent by Judge TROTT.
ORDER
The opinion filed on November 11, 2009 is amended as follows:
Slip opinion at page 15123 [586 F.3d 735, 747-48], first paragraph, line 7, delete portion of paragraph beginning “Furthermore” and concluding at the end of the paragraph with “Id.” Insert footnote at line 7, at the conclusion of the revised paragraph. The footnote shall read:
DOI’s current NEPA guidelines take the exact opposite approach to that of the Corps regulations in Angoon. DOI’s NEPA handbook explains that the “purpose and need statement for an externally generated action must describe the BLM purpose and need, not an applicant’s or external proponent’s purpose and need.” Department of Interior, Bureau of Land Management, National Environmental Policy Act Handbook 35, (citing 40 C.F.R. § 1502.13) (emphasis added), available at http://www.blm.gov/ pgdata/etc/medialib/blm/wo/Information_ Resources JManagemenVpolicy/blm_ handbook.Par.24487.File.dat/hl790-l2008-l.pdf (citing 40 C.F.R. § 1502.13) (emphasis added). “The applicant’s purpose and need may provide useful background information, but this description must not be confused with the BLM purpose and need for action.... It is the BLM purpose and need for action that will dictate the range of alternatives ....” Id.
Slip opinion at page 15124 [586 F.3d at 748], line 4, delete the sentence beginning “That the BLM does not____” Replace with “Kaiser may desire to find a viable use for mine by-products located on its *1062 private land holdings, but the BLM has no need to do so.”
Slip opinion at page 15125 [586 F.3d at 748], delete the final sentence of footnote 9.
All pending amicus motions are GRANTED. All petitions for panel rehearing and rehearing en banc remain pending.
OPINION
PREGERSON, Circuit Judge:
Kaiser Eagle Mountain, Inc. (“Kaiser”) seeks to build a landfill on a former Kaiser mining site near Joshua Tree National Park (“Joshua Tree”). As part of its landfill development plan, Kaiser sought to exchange certain private lands for several parcels of land surrounding the mine site and owned by the Bureau of Land Management (“BLM”). Several parties, including the National Parks Conservation Association (“Conservation Association”) and Donna and Laurence Charpied (“the Charpieds”), challenged the land exchange. Nevertheless, the BLM approved the land exchange, as did the Interior Board of Land Appeals (“Appeals Board”).
The Conservation Association and the Charpieds pursued challenges in district court on several grounds, including violations of the Federal Land and Policy Management Act (“Management Act”) and National Environmental Policy Act (“NEPA”). The district court held for the Conservation Association and Charpieds on the Management Act claims and some, but not all, of the NEPA claims. We have jurisdiction under 28 U.S.C. § 1291 and affirm in part and reverse in part.
I. Background
Kaiser owned and operated an iron ore mine near the Eagle Mountain range in Riverside County, California from 1948 to 1983. The mine area covered over 5,000 acres and included four large open pits. The mine area also included a 429-acre “Townsite,” which housed mine workers and support personnel, and over which the United States owns a reversionary interest. Though Kaiser currently leases the Townsite for use as a correctional facility, the majority of the mine site lies dormant. The disturbed lands, which contain large quantities of mine tailings, have not been reclaimed.
The BLM owns several parcels of land surrounding the former mine site. In 1989, Kaiser sought to acquire these parcels through a land exchange. Under Kaiser’s proposal, Kaiser will acquire 3,481 acres of public land, the United States’s reversionary interest in the Townsite, and permanent rights-of-way over the dormant Eagle Mountain Railroad and Eagle Mountain Road. In exchange, Kaiser offered 2,846 acres of private land near other BLM lands and within an area designated as critical habitat for the desert tortoise.
Kaiser’s ultimate goal is to develop the largest landfill in the United States. The proposed landfill project will cover 4,654 acres, including support and “buffer” areas. The landfill will accept solid wastes from several Southern California communities. The majority of the waste will be transported by train, though there will also be some truck and “self-haul” loads. The project is designed to operate for 117 years. At its peak, the proposed landfill will accept 20,000 tons of garbage per day, six days a week, for up to sixteen hours per day. During the final phase of the project, to commence in roughly seventy-eight years, garbage will be deposited into the largest of the four open mining pits, the East Pit. The remaining pits will not be filled. The total capacity of the proposed landfill is approximately 708 million tons.
Both Joshua Tree and the Kaiser mine site lie within a large desert wilderness *1063 area that is home to several sensitive plant and animal species, including the desert tortoise and Bighorn sheep. The proposed landfill site sits within one and-a-half miles of Joshua Tree. The landfill would be visible from remote areas of Joshua Tree.
As part of its analysis of the proposed land exchange, the BLM produced a Draft Environmental Impact Statement (“EIS”). The EIS described the purpose and need of the project as follows:
The primary purpose of the Project is to develop a new Class III nonhazardous municipal solid waste landfill to meet the projected long-term demand for environmentally sound landfill capacity in Southern California; provide a long-term income source from the development of a nonhazardous municipal solid waste landfill; find an economically viable use for the existing mining by-products at the Kaiser Eagle Mountain Mine site, including use of existing aggregate and overburden; and provide long-term land use and development goals and guidance for the Townsite.
With these purposes in mind, the BLM considered six alternatives in detail: (1) No action; (2) Reduced volume of waste; (3) Alternate road access; (4) Rail access only; (5) Landfill on Kaiser land only; and (6) Landfill development without Townsite development.
The BLM also commissioned an appraisal report on the proposed exchange lands from David J. Yerke, Inc. (“the Yerke appraisal”). The Yerke appraisal found that the “highest and best use” of the public lands in question was “holding for speculative investment.” The appraisal explicitly stated that it did “not take into consideration any aspects of the proposed landfill project.” The Yerke appraisal therefore valued the public parcels surrounding the mine site at roughly $77 per acre and the Townsite at roughly $106 per acre.[1] The appraisal valued the Kaiser lands to be exchanged at approximately $104 per acre. The BLM subsequently required Kaiser to pay $20,100, the difference between the value of the exchanged public lands and Kaiser’s parcels.
In 1997, the BLM adopted a Final EIS, incorporating the Draft EIS, and issued a Record of Decision approving the land exchange as proposed by Kaiser. The Conservation Association and Charpieds filed administrative protests with the BLM. When those protests were denied, the Conservation Association and Charpieds separately appealed to the Appeals Board. The Appeals Board affirmed the BLM’s decision in a separate decision, incorporating the Draft and Final EIS, in September 1999.
The Conservation Association and the Charpieds (hereinafter, collectively “Conservation Association”) filed separate complaints in the district court seeking review under the Administrative Procedure Act and alleging violations of the Management Act and NEPA. The district court consolidated the complaints. On cross-motions for summary judgment, the district court ruled in the Conservation Association’s favor, in part. Looking only to the Record of Decision, the district court set aside the land exchange because: (1) the BLM did not give “full consideration” to whether the land exchange is in the public interest; (2) the Yerke appraisal failed to consider a landfill as a “highest and best use”; (3) the EIS’s “purpose and need” statement was too narrowly drawn, with accordingly narrow potential alternatives foreordaining landfill development; and (4) the BLM failed to take a “hard look” at potential impacts on Bighorn sheep and the effects *1064 of nitrogen enrichment on the nutrient-poor desert environment. This appeal followed.
II. Standard of Review
We review a grant or denial of summary judgment de novo. Northwest Envtl. Advocates v. Nat’l Marine Fisheries Serv., 460 F.3d 1125, 1132 (9th Cir.2006). We may only overturn agency action that is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” Great Basin Mine Watch v. Hankins, 456 F.3d 955, 961-62 (9th Cir.2006); 5 U.S.C. § 706(2)(A).
III. Scope of Review
As a preliminary matter, we must first identify the agency action under our review. The Conservation Association argues, as the district court held, that the Record of Decision constitutes final agency action. We disagree.
Under the Administrative Procedure Act, only “final agency action” is subject to judicial review. 5 U.S.C. § 704. The BLM is part of the Department of the Interior (“DOI”). DOI regulations state that, barring a petition for a stay, a decision will become effective upon the expiration of the appeal period. 43 C.F.R. § 4.21(a)(2). If an Appeals Board fails to act upon a petition for a stay or denies such a petition, the decision becomes effective immediately. 43 C.F.R. § 4.21(a)(3). The Appeals Board’s decisions, in contrast, constitute final agency action when made. “The Board [of Land Appeals] decides finally for the Department [of Interior] appeals to the head of the Department from decisions rendered by Departmental officials relating to ... [t]he use and disposition of public lands.... ” 43 C.F.R. § 4.1(b)(3)®. “A decision of the Board shall constitute final agency action and be effective upon the date of issuance, unless the decision itself provides otherwise.” 43 C.F.R. § 4.403.[2]
In the case before us, the Record of Decision never became effective, and cannot serve as the agency’s final action. The language of the Administrative Procedure Act does not support the Conservation Association’s arguments. “[A]gency action otherwise final is final ... whether or not there has been presented or determined an application for ... any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.” 5 U.S.C. § 704. The Conservation Association contends that no rule renders the Record of Decision inoperative during the pendency of the appeal, and therefore the Record of Decision is a final action. This court has held, however, that “exercise of an optional appeal to a Department ALJ renders the initial Administrator’s decision nonfinal for purposes of judicial review under the APA.” Acura of Bellevue v. Reich, 90 F.3d 1403, 1407 (9th Cir.1996). Furthermore, the Conservation Association’s argument ignores the “otherwise final” language of the Administrative Procedure Act. DOI rules need not explicitly render the Record of Decision inoperative because, in a case such as that before us, the decision was never effective in the first instance.[3]
*1065 We note that in some cases, a Record of Decision may constitute final agency action. For example, where there is no administrative appeal, a Record of Decision will become effective and final following the expiration of the appeal period, in accordance with 43 C.F.R. § 4.21(a)(2). Similarly, where the Appeals Board denies a petition for a stay, a Record of Decision will become effective and final in accordance with 43 C.F.R. § 4.21(a)(3). Indeed, this was the situation in Desert Citizens Against Pollution v. Bisson, 231 F.3d 1172 (9th Cir.2000). There, the Appeals Board denied a petition for a stay. Id. at 1175. This court therefore reviewed the Record of Decision as the final agency action. See, e.g., id. at 1182. In the case before us, in contrast, the Appeals Board granted a stay. The Record of Decision therefore never became effective and was not the final agency action. We reverse the district court to the extent that it limited its review to the Record of Decision. The Appeals Board decision, which incorporated the Environmental Impact Statement, is the final agency action before us for review.
IV. Federal Land and Policy Management Act Claims
Kaiser and the BLM appeal the district court’s determinations that the Yerke appraisal was inadequate and that the BLM failed to give “full consideration” to whether the land exchange well serves the public interest.

A. Highest and Best Use

1. Exhaustion of Administrative Remedies

In district court, the Conservation Association challenged the BLM’s appraisal of the exchange lands on the ground that the BLM failed to consider a landfill as the “highest and best use” of the public parcels. Kaiser and the BLM argue, as they did before the district court, that the Conservation Association failed to exhaust this issue before the Appeals Board, and that this court should not review the highest and best use claim.
“As a general rule, we will not consider issues not presented before an administrative proceeding at the appropriate time.” Marathon Oil Co. v. United States, 807 F.2d 759, 767-68 (9th Cir.1986). However, we have repeatedly held that the exhaustion requirement should be interpreted broadly. Plaintiffs fulfill the requirement if their appeal “provided sufficient notice to the [agency] to afford it the opportunity to rectify the violations that the plaintiffs alleged.” Native Ecosystems v. Dombeck, 304 F.3d 886, 899 (9th Cir. 2002). Plaintiffs need not state their claims in precise legal terms, and need only raise an issue “with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met.” Great Basin Mine Watch v. Hankins, 456 F.3d at 968 (internal quotation omitted).
In the case before us, we are satisfied that the Appeals Board received sufficient notice to allow the agency to respond to *1066 the highest and best use issue. Although the Conservation Association did not use the words “highest and best use,” its Statement of Reasons for appeal to the Appeals Board stated:
THE BLM WILL NOT RECEIVE FAIR MARKET VALUE FOR THE EXCHANGE. Any disposal of federal lands must be compensated at “fair market value of the use of public lands and their resources.” 43 U.S.C.A. § 1701(a).... Kaiser will also pay BLM a lump sum of $20,100, which is below the fair market value. Kaiser anticipates huge profits from a landfill operation on the undervalued BLM land....
(emphasis added). In their separate Statement of Reasons, the Charpieds argued that “the public should receive fair appraisal for its lands,” and “[n]ot an appraisal that has been artificially reduced in value through instructions to discount developments, improvements, and recent zoning changes.”
These statements adequately raised the highest and best use issue before the Appeals Board.[4] The Yerke appraisal explicitly states that it does not consider any aspect of the landfill project. The Conservation Association’s Statement of Reasons highlighted the BLM’s failure to appraise the land’s fair market value as a landfill. The highest and best use analysis is an integral part of the appraisal process. 43 C.F.R. § 2201.3-2(a)(l) (“In estimating market value, the appraiser shall: (1) Determine the highest and best use of the property to be appraised[.]”). Under such a backdrop, the Appeals Board had sufficient notice to address the highest and best use issue.

2. Merits of the Highest and Best Use Claim

The statutory and regulatory requirements governing appraisals are numerous. The Management Act requires the BLM to appraise lands before agreeing to a land exchange. 43 U.S.C. § 1716(d)(1). This appraisal must set forth an opinion regarding the market value of the lands “supported by the presentation and analysis of relevant market information.” 43 C.F.R. § 2200.0-5(c). Market value “means the most probable price ... that lands or interests in lands should bring in a competitive and open market ... where the buyer and seller each acts prudently and knowledgeably.” 43 C.F.R. § 2200.0-5(n). “In estimating market value, the appraiser shall: (1) Determine the highest and best use of the property to be appraised”; and “(2) Estimate the value of the lands and interests as if in private ownership and available for sale in the open market.” 43 C.F.R. § 2201.3 — 2(a)(1)—(2). “Highest and best use means the most probable legal use of a property, based on market evidence as of the date of valuation, expressed in an appraiser’s supported opinion.” 43 C.F.R. § 2200.0~5(k).
The appraisal must also comply, to the extent appropriate, with the separate requirements of the Uniform Appraisal Standards for Federal Land Acquisitions. 43 C.F.R. § 2201.3. Under the Uniform Appraisal Standards definition, highest and best use is “ ‘[t]he highest and most profit *1067 able use for which the property is adaptable and needed or likely to be needed in the reasonably near future.’ ” The Appraisal Institute, Uniform Appraisal Standards for Federal Land Acquisitions 34 (quoting Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)), available at http://www.usdoj.gov/ enrd/land-ack/yb2001.pdf. While Department of Interior regulations define highest and best use as the “most probable” use of land, the Uniform Standards only require “reasonable probability” of a given use. Uniform Standards at 34; Desert Citizens, 231 F.3d at 1181 n. 10. Under the Uniform Standards, the highest and best use must also be: (1) physically possible; (2) legally permissible; (3) financially feasible; and (4) must result in the highest value. Uniform Standards at 17.
In Desert Citizens, we examined a highest and best use claim almost identical to that presented in the instant case. Desert Citizens, 231 F.3d at 1175, 1180. In Desert Citizens, a mine operator proposed a land exchange to the BLM in connection with the development of the Mesquite Regional Landfill on and near the Mesquite Mine. Id. at 1175. An appraisal of the public lands concluded that the highest and best use was “open space” or “mine support.” Id. At the time of the appraisal, the mine operator had already applied for county permits to build the landfill. Id. The district court upheld the appraisal on the grounds that there was no market demand for a landfill and that landfill development was an expensive, risky venture. Id. at 1180.
We reversed. After analyzing the statutory and regulatory framework regarding highest and best use, we held that “uses that are reasonably probable must be analyzed as a necessary part of the highest and best use determination. This analysis must have due regard for the existing business or wants of the community, or such needs as may be reasonably expected to develop in the near future.” Id. at 1181 (internal quotations and citations omitted). We observed that because the lands in question “were expected to be used for landfill purposes” and because the “existence of other landfill proposals in the region indicated a general market for landfill development,” landfill use was reasonably probable and must “at the very least ” have been considered in the highest and best use analysis. Id. (emphasis added).
We then proceeded to analyze the physical, legal, and financial feasibility of the proposed Mesquite Landfill, in accordance with the Uniform Appraisal Standards. Id. at 1184. In our discussion of financial feasibility, we held that “a regional market and the presence of competitors sponsoring similar projects made reasonably probable, prior to the ... appraisal, that use of the lands for landfill purposes was financially feasible.” Id. at 1185. Among the other landfill proposals we relied upon as evidence of market demand was the “Eagle Mountain Regional Landfill proposed by Kaiser.” Id.
The facts of Desert Citizens are virtually identical to the facts before us in the instant case. Kaiser applied for county permits before the Yerke appraisal was drafted. The Yerke appraisal was clearly cognizant of Kaiser’s proposal, yet explicitly stated that it was not taking “into consideration any aspect of the proposed landfill project.” Kaiser and the BLM do not contest the physical or legal feasibility of constructing a landfill at the Eagle Mountain site. As for financial feasibility, we held in Desert Citizens that the presence of competing proposals alone is sufficient to establish market demand and financial feasibility. Id. If the Kaiser landfill proposal was sufficient to establish a reasonable probability of the Mesquite Landfill’s financial feasibility, the Mesquite Landfill *1068 and other proposals must demonstrate similar feasibility of the Kaiser project.
The BLM tries to distinguish Desert Citizens by arguing that here, BLM market analyses did not show that there were other landfill proposals in the area, and therefore there is no evidence of market demand. This argument distorts the facts of Desert Citizens and misses the point entirely. Contrary to the BLM’s assertions, in Desert Citizens we did not look to the BLM’s own market analyses for proof of market demand. To the contrary, the BLM’s position, as articulated by the district court, was that market demand did not exist. Id. at 1180. In reversing this determination, we looked not to any BLM market analysis, but rather to the obvious and well-known presence of competing landfill proposals. Id. at 1185. Indeed, we found the appraiser’s willful ignorance of facts of “general notoriety” “particularly troubling.” Id. at 1182.
Kaiser and the BLM have failed to distinguish the facts of this case from those of Desert Citizens.[5] As such, the highest and best use analysis should have taken the reasonably probable use of public lands for a landfill into consideration as part of the highest and best use analysis. As we stated in Desert Citizens:
[T]he use of the land as a landfill was not only reasonable, it was the specific intent of the exchange that it be used for that purpose. There is no principled reason why the BLM, or any federal agency, should remain willfully blind to the value of federal lands by acting contrary to the most elementary principles of real estate transactions.
231 F.3d at 1184. We therefore affirm the district court’s grant of summary judg *1069 ment on the highest and best use claim under the Management Act.

B. The Public Interest Determination

Under the Federal Land Policy and Management Act, the BLM must determine that “the public interest will be well served” by a land exchange before approving such an exchange. 43 U.S.C. § 1716(a); see also 43 C.F.R. § 2200.0-6(b). This determination “shall give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas ... and fish and wildlife ....” 43 U.S.C. § 1716(a). A determination that an exchange well-serves the public interest must be predicated on a finding that:
(1) The resource values and the public objectives that the Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the resource values of the non-Federal lands or interests and the public objectives they could serve if acquired^[6]] and (2) The intended use of the conveyed Federal lands will not, in the determination of the authorized officer, significantly conflict with established management objectives on adjacent Federal lands and Indian trust lands. Such finding and the supporting rationale shall be made part of the administrative record.
43 C.F.R. § 2200.0-6(b).
The Management Act does not define the term “full consideration.” Our review is thus limited to the question whether the BLM’s interpretation of the term is based on a permissible construction of the statute. Chevron U.S.A., Inc. v. Nat’l Res. Def. Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We review the entire record to determine whether the agency’s decision was based on a reasonable consideration of the relevant factors. Hjelvik v. Babbitt, 198 F.3d 1072, 1074 (9th Cir.1999).
The district court’s analysis was constrained by its decision to review only the Record of Decision. Having held that the Appeals Board’s decision, which incorporates the EIS, is the final agency action under review, we examine a broader set of materials than did the district court. The Final EIS alone includes over 1,600 pages of material not considered by the district court, including detailed environmental analyses. Though we do not necessarily agree with the BLM’s public interest determination, the record as a whole establishes that the BLM’s interpretation of “full consideration,” as evinced by the analyses in the EIS, is permissible under 43 U.S.C. § 1716(a).[7] Accordingly, we reverse the district court’s determination on this issue.
Y. National Environmental Policy Act Claims
The National Environmental Policy Act requires federal agencies to prepare an Environmental Impact Statement discussing, among other things, the environmental impact of a proposed action, any adverse environmental effects which cannot be avoided, and alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). In addition, implementing regulations require that the agency state the underlying purpose and need for the proposed action. 40 C.F.R. § 1502.13. Kaiser and the BLM *1070 appeal the district court’s holding that the EIS was deficient with respect to purpose and need, reasonable alternatives, impacts on Bighorn sheep, and eutrophication.[8]

A. Purpose and Need and Reasonable Alternatives

Agencies enjoy “considerable discretion” to define the purpose and need of a project. Friends of Southeast’s Future v. Morrison, 153 F.3d 1059, 1066 (9th Cir.1998). However, “an agency cannot define its objectives in unreasonably narrow terms.” City of CarmeP-By-The-Sea v. United States Dep’t. of Transp., 123 F.3d 1142, 1155 (9th Cir.1997). As the Friends court stated, “An agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency’s power would accomplish the goals of the agency’s action, and the EIS would become a foreordained formality.” Friends, 153 F.3d at 1066 (quoting Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 196 (D.C.Cir.1991), cert. denied, 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991)) (correction in original). We evaluate an agency’s statement of purpose under a reasonableness standard. Id. at 1066-67.
In the case before us, the purpose and need statement reads:
The primary purpose of the Project is to develop a new Class III nonhazardous municipal solid waste landfill to meet the projected long-term demand for environmentally sound landfill capacity in Southern California; provide a long-term income source from the development of a nonhazardous municipal solid waste landfill; find an economically viable use for the existing by-products at the Kaiser Eagle Mountain Mine site, including use of existing aggregate and overburden; and provide long-term land use and development goals and guidance for the Townsite.
The Conservation Association contends, and the BLM does not dispute, that the majority of these purposes and needs respond to Kaiser’s goals, not those of the BLM. Other circuits have held that agencies must acknowledge private goals. Colorado Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1175 (10th Cir.1999) (“Agencies ... are precluded from completely ignoring a private applicant’s objectives.”); Burlington, 938 F.2d at 196 (“[T]he agency should take into account the needs and goals of the parties involved in the application.”). Requiring agencies to consider private objectives, however, is a far cry from mandating that those private interests define the scope of the proposed project. Instead, as the Burlington court held:
[Ajgencies must look hard at the factors relevant to the definition of purpose.... Perhaps more importantly [than the need to take private interests into account], an agency should always consider the views of Congress, expressed, to the extent that the agency can determine them, in the agency’s statutory authorization to act, as well as in other congressional directives.
Id. We agree.
Burlington does not conflict with our decision in City of Angoon v. Model, 803 F.2d 1016 (9th Cir.1986). In Angoon, a private party sought a federal permit to build a log-transfer facility on its own lands. Id. at 1019. As part of an EIS, the Army Corps of Engineers (“the Corps”) identified a purpose and need to provide a “safe, cost effective means of transferring *1071 timber harvested on [the privately owned] land.” Id. at 1021. The district court eliminated the private land specification, and restated the purpose and need as “commercial timber harvesting.” Id. We reversed, rejecting the district court’s “broad social interest” formulation in favor of the Corps’s “more balanced” statement. Id.
Angoon is distinguishable from the situation in the case before us. In Angoon, the issue was whether the Corps should issue a permit. Id. at 1017-18. As discussed above, agencies must look hard at the factors relevant to definition of purpose. In Angoon, those factors included a regulatory framework far different from that guiding the BLM here. The relevant Corps regulations in Angoon explicitly stated that “every application has both an applicant’s purpose and need and a public purpose and need” and specified that a Corps EIS must document alternatives “which would satisfy the purpose and need ... for which the applicant has submitted his proposal.” Id. at 1021 (citing 33 C.F.R. pt. 230, App. B(11)(b)(4)-(5) (1985) (emphasis added)). We therefore held that the Corps’s purpose and need statement, which emphasized private goals, reasonably balanced the relevant factors. Id.
In contrast, the Department of Interior has promulgated no regulations emphasizing the primacy of private interests. The DOI analogue to the Corps’s regulation, 40 C.F.R. § 1502.13, merely requires that an EIS “briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.”[9]
The BLM’s definition of the project’s purpose will necessarily affect the range of alternatives considered, because when “the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.” Angoon, 803 F.2d at 1021. Our task is to determine whether the BLM’s purpose and need statement properly states the BLM’s purpose and need, against the background of a private need, in a manner broad enough to allow consideration of a reasonable range of alternatives. In the case before us, the purpose and need statement sets out four goals: (1) to meet long-term landfill demand; (2) to provide a longterm income source from a landfill; (3) to find a viable use for mine byproducts; and (4) to develop long-term development plans for the Townsite. The first, to meet long-term landfill demand, is unquestionably a valid BLM purpose. The remaining three goals, however, can hardly be characterized as BLM needs. Kaiser and its successors in interest, not the BLM, will be the recipient of any long-term income from the landfill. Kaiser may desire to find a viable use for mine byproducts located on its private land holdings, but the BLM has no need to do so. Kaiser, not the BLM, currently operates the Townsite, in which it stands to receive a fee interest, and would be the beneficiary of any long-term development plans.
*1072 The purpose and need statement, though it includes one BLM goal, also sets out three private objectives as defining characteristics of the proposed project. Such a narrowly drawn statement necessarily and unreasonably constrains the possible range of alternatives. The BLM considered only six alternatives in detail: (1) No action; (2) Reduced volume of waste; (3) Alternate road access; (4) Rail access only; (5) Landfill on Kaiser land only; and (6) Landfill development without Townsite development. All of these options, save the No Action alternative, would result in landfill development of some sort and would require some portion of the land exchange to occur.
The BLM proposed several alternatives that would have been responsive to the need to meet long-term landfill demand, such as a landfill on other Kaiser property, waste diversion, offsite landfill locations, landfill mining, alternative Townsite locations, and alternative Townsite uses. The BLM did not, however, consider these options in any detail because each of these alternatives failed to meet the narrowly drawn project objectives, which required that Kaiser’s private needs be met.
Our holdings in Friends and Carmel-By-The-Sea forbid the BLM to define its objectives in unreasonably narrow terms. The BLM may not circumvent this proscription by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives, yet that was the result of the process here. The BLM adopted Kaiser’s interests as its own to craft a purpose and need statement so narrowly drawn as to foreordain approval of the land exchange.[10] As a result of this unreasonably narrow purpose and need statement, the BLM necessarily considered an unreasonably narrow range of alternatives. We therefore affirm the district court’s grant of summary judgment on both the “purpose and need” and “reasonable range of alternatives” claims under NEPA.

B. Bighorn Sheep

Under NEPA, an EIS must contain a “reasonably thorough” discussion of an action’s environmental consequences. State of California v. Block, 690 F.2d 753, 761 (9th Cir.1982). An EIS must “provide full and fair discussion of significant environmental impacts.” 40 C.F.R. § 1502.1. Our review is limited to whether an EIS took a “hard look” at the environmental impacts of a proposed action. Id. We must make a “pragmatic judgment whether the EIS’s form, content and preparation foster both informed decision-making and informed public participation.” Block, 690 F.2d at 761.
Contrary to the district court’s conclusion, we find that the EIS contains extensive analyses of potential impacts on Bighorn sheep, including migration patterns, habitat loss, and water accessibility. The district court cited two particular deficiencies with respect to Bighorn sheep. The district court found that the EIS did not address the potential impact of tortoise-proof fencing on sheep migration patterns and failed to specify what a proposed “buffer zone” would entail.
*1073 The EIS does, however, contain the information the district court believed was missing.[11] The EIS includes a 56-page report on Bighorn sheep. The report is based on an extensive monitoring study, utilizing sheep capture, radio telemetry, and genetic testing methods. The EIS states that any installed tortoise-proof fencing will be designed to allow for sheep movement.[12] The EIS explains that the buffer zone constituting “644 acres of potential habitat would remain as natural open space around the periphery of the proposed landfill. This habitat would provide a buffer zone between the landfill operation and relocated sheep population.” [13] Though the EIS does not “exactly specify” what the buffer zone entails, it does contain a “reasonably complete” discussion of this mitigation measure. See Okanogan Highlands Alliance v. Williams, 236 F.3d 468, 473 (9th Cir.2000) (holding that an EIS must include a “reasonably complete discussion of possible mitigation measures.”). We are not authorized to substitute our judgment for that of the agency. Block, 690 F.2d at 761. Having concluded that the BLM did take a “hard look” at Bighorn sheep, our review is at an end. Id. We reverse the district court on this issue.

C. Eutrophication

We apply the same analysis to the district court’s conclusion that the EIS insufficiently addressed the potential for eutrophication, or introduction of nutrients into the desert environment. Unlike its discussion of Bighorn sheep, the EIS contains no specific discussion of eutrophication. The BLM argues that the relevant discussion is present in other, scattered sections of the EIS. The EIS does, for example, discuss “Biological Resources” and “Air Quality.” The “Biological Resources” section discusses mitigation measures, such as daily cover of the working face of the landfill, that will reduce “increased food availability.” The same “Biological Resources” section references a separate “Air Quality” section, which calculates potential levels of nitrate production, to support the conclusion that atmospheric nitrate deposition resulting from landfill operations will be dwarfed by other sources in the Los Angeles Basin. The EIS therefore concludes that nitrate deposition from landfill sources will have no effect on Joshua Tree’s ecosystem.
In determining whether an EIS fosters informed decision-making and public participation, we consider not only its content, but also its form. Block, 690 F.2d at 761. Here, the discussion of eutrophication is neither full nor fair with respect to atmospheric eutrophication. A reader seeking enlightenment on the issue would have to cull through entirely unrelated sections of the EIS and then put the pieces together. To find the brief discussion of atmospheric eutrophication, a reader must begin in the “Biological Resources” section, which then refers to data from the “Air Quality” section, and then with respect to effects only on Joshua Tree, not the surrounding area. Rather than address eutrophication up front, the BLM instead attempts to cobble together a “hard look” from various other analyses as varied as air quality and dis *1074 ease vector control. This patchwork cannot serve as a “reasonably thorough” discussion of the eutrophication issue.[14] We therefore affirm the district court’s decision on this NEPA claim.
VI. Cross-Appeal
The Charpieds cross-appeal the district court’s determination that they lacked standing to pursue their claim against the National Park Service (“Park Service”) under NEPA, the National Park Service Organic Act, 16 U.S.C. § 1, and the California Desert Protection Act, 16 U.S.C. § 410aaa, et seq. The Charpieds also appeal the district court’s grant of summary judgment to Kaiser and the BLM on NEPA claims concerning the EIS’s sufficiency regarding desert tortoises, visual, noise, and night lighting impacts, groundwater, and air quality. We affirm the district court on all issues on cross-appeal.
Although the BLM was required to solicit the Park Service’s input on the EIS, 40 C.F.R. § 1503.1, the BLM did not need the Park Service’s approval to complete the land exchange. The Park Service was involved in the Kaiser proposal only as a cooperating agency. NEPA regulations distinguish lead agencies from cooperating agencies. 40 C.F.R. § 1501.6. Cooperating agencies must, at the request of the lead agency, help prepare environmental analyses, including portions of the EIS. Id. In October 1996 the Park Service recommended that the BLM reject the Kaiser proposal and stated that the Draft EIS did not sufficiently address certain environmental impacts. In December 1996 the Park Service changed its position, and supported the EIS and Kaiser proposal.
Standing requires three elements: (1) actual or imminent injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) likelihood that a favorable decision will redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561-62, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Charpieds argue that the Park Service’s reversal constituted a procedural violation under NEPA, the California Desert Protection Act, and the National Park Service Organic Act, and that relaxed standards of redressability should apply. See Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130. The Charpieds, however, have not identified any violation of a procedural duty by the Park Service.[15] The relaxed standard therefore does not apply. A favorable decision would not redress the injury complained of because the Park Service is not the lead agency responsible for approving the Kaiser project. Even if the Park Service were to rescind its approval of the landfill *1075 project, the BLM, as the lead agency, would be free to move forward. Accordingly, we affirm the district court’s holding that the Charpieds lack standing under NEPA, the National Park Service Organic Act, and the California Desert Protection Act.
Lastly, we briefly address the Charpieds’ impact-specific NEPA claims. As discussed above, our review is limited to whether the EIS took a “hard look” at the landfill’s potential environmental impact. Block, 690 F.2d at 761. In challenging the EIS’s discussion of desert tortoises, visual, noise, and night lighting impacts, groundwater, and air quality, the Charpieds take issue with the EIS’s methodology and ultimate conclusions. Without taking a position on those conclusions, we find that the EIS’s discussion of these issues is sufficient to foster informed decision-making and public participation. We therefore affirm the district court’s grant of summary judgment on these NEPA claims, as well as its dismissal of the Charpieds’ complaint against the Park Service.
VII. Conclusion
The judgment of the district court is AFFIRMED in part and REVERSED in part. This case is REMANDED for further proceedings consistent with this opinion. Each side shall bear its own costs on appeal.

. The Los Angeles County Sanitation District has since entered into a conditional agreement to purchase the landfill property and permits for over $8,800 per acre.

. The Conservation Association argues that 43 C.F.R. § 4.403 applies only to Appeals Board actions, and does nothing to rob the Record of Decision of its finality. Taken to its logical conclusion, this argument would allow for two independent, and potentially conflicting, "final” agency actions. This cannot be.

. Contrary to Kaiser's suggestion, our holding is not compelled by 43 C.F.R. § 4.21(c). § 4.21(c) states:
No decision which at the time of its rendition is subject to appeal to the Director or an Appeals Board shall be considered final so as to be agency action subject to judicial *1065 review under 5 U.S.C. 704, unless [1] a petition for a stay of decision has been timely filed and [2] the decision being appealed has been made effective ....
(Emphasis added). This subsection deals with exhaustion of administrative remedies, not finality of agency action. If taken, as Kaiser suggests, to touch upon finality of agency action, § 4.21(c)’s requirement that a petition for stay be timely filed would render all actions not subject to a petition for stay non-final, and thus unreviewable.

. The dissent finds language such as "appraisers failed to consider that the Federal land to be exchanged is proposed to be used as a landfill, and that, as a result, the land should be valued ... in comparison to landfill sites” satisfactory to exhaust the highest and best use issue. Dissent at 1096 (quoting Donna Charpied, 137 IBLA 45, 47 (1996)). We see no meaningful distinction between this language and that presented in the case before us, which highlights that Kaiser will reap profits "from a landfill operation,” will pay "below the fair market value,” and that the appraisal unfairly ignored development and zoning changes.

. Kaiser and the BLM rely heavily on a 2002 report compiled by the Herzog Group as part of the litigation of this case. This report was not before either the BLM or the Appeals Board. Accordingly, we do not consider it here. See, e.g., Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 450 F.3d 930, 943 (9th Cir.2006) ("Parties may not use post-decision information as a new rationalization either for sustaining or attacking the Agency's decision.” (internal quotation omitted)).
The dissent erroneously concludes that the Herzog "appraisal” cured any deficiency in the Yerke appraisal, and that we should therefore consider the Herzog report under our decision in Friends of the Clearwater v. Dombeck, 222 F.3d 552 (9th Cir.2000). Dissent at 1098-99. In Dombeck, we considered supplemental materials presented after the onset of litigation where a remand would be pointless because a court "could not order the [agency] to conduct studies already completed to answer questions the [agency] already answered on a basis that could not be successfully challenged.” Id. at 560 (internal quotation omitted). Kaiser argues that (1) the Herzog report did consider highest and best use, as required by our decision in Desert Citizens, (2) the BLM has rendered a final decision accepting the Herzog analysis, and (3) the Conservation Association failed to appeal that "decision.”
First, we note that Dombeck concerned a NEPA violation, whereas here we examine a Management Act violation. Dombeck also specifically distinguished suits to compel agency action from challenges, such as that before us here, to a final agency action. Regardless of these distinctions, Dombeck is inapplicable because the record does not demonstrate that the BLM has cured the defects of the Yerke appraisal on a basis that is immune to challenge. Kaiser points to, and the dissent apparently relies upon, a letter from a BLM district manager to the State Director in which the district manager favorably references the Herzog report in the course of reiterating that the land exchange well serves the public interest. This letter hardly establishes that the BLM has cured the Management Act deficiencies of the Yerke appraisal "on a basis that could not be successfully challenged.” There is nothing in the record to indicate that the BLM has rendered a final, appealable decision on an appraisal that properly considers landfill use as a highest and best use. Dombeck therefore does not apply, and we do not consider the 2002 Herzog report.

. In other words, the BLM must find that the resource values of the public land being conveyed do not outweigh the resource values of the private land being acquired.

. In agreeing with this conclusion, the dissent quotes several examples of these sufficient Management Act public interest analyses, albeit in the context of a separate "purpose and need" issue under the National Environmental Policy Act. Dissent at 1079-84.

. Eutrophication, in this context, refers to the introduction of nutrients to the desert environment. The eutrophication discussion in this case focuses on two potential pathways: (1) landfill waste material; and (2) nitrogen-bearing airborne emissions.

. DOI’s current NEPA guidelines take the exact opposite approach to that of the Corps regulations in Angoon. DOI’s NEPA handbook explains that the “purpose and need statement for an externally generated action must describe the BLM purpose and need, not an applicant’s or external proponent’s purpose and need." Department of Interior, Bureau of Land Management, National Environmental Policy Act Handbook 35, (citing 40 C.F.R. § 1502.13) (emphasis added), available at http://www.blm.gov/pgdata/etc/medialibA3lm/ wo/Information_Resources_Managernent/ policy/blm_handbook.Par.24487.File.dat/ hl790-l-2008-l.pdf (citing 40 C.F.R. § 1502.13) (emphasis added). “The applicant’s purpose and need may provide useful background information, but this description must not be confused with the BLM purpose and need for action.... It is the BLM pur *1072 pose and need for action that will dictate the range of alternatives....” Id.

. The dissent conflates two unrelated issues: (1) adequacy of the purpose and need statement under NEPA and (2) adequacy of the public interest determination under the Management Act. Dissent at 1082-83. Whether the BLM gave full consideration to public interest factors, however, has no bearing on the sufficiency of the EIS under NEPA. The dissent concludes that so long as the BLM properly concluded that the project is in the public interest, there is no NEPA violation— that is, that the ends justify the means. We disagree.

. The Final EIS incorporated the earlier Draft EIS.

. Other evidence in the record indicates that fencing of this type is eighteen inches high; high enough to restrict tortoise movement but low enough to present no obstacle to Bighorn sheep.

. The Riverside County Specific Plan clarifies that the 644 acre area will provide a buffer between sheep and the footprint of the landfill.

. The dissent’s contention that eutrophication is “not a serious issue” is at odds with the analysis of both the National Park Service and the IBLA. The National Park Service found the eutrophication issue sufficiently serious as to merit an official comment, as the dissent itself points out. Dissent at 1087-88. The IBLA did not take the position that eutrophication is unimportant, but instead concluded that the EIS adequately took a "hard look” at the issue.
The dissent contends that the EIS contains a "map” to the eutrophication issue that is sufficient to meet the "hard look” requirement.” Dissent at 1087-88. Whether the dissent or a reviewing court, examining an EIS with the benefit of law clerks and post-hoc rationalizations from counsel, is able to follow a tortuous map to the buried treasure of a eutrophication discussion is not the question. In examining an EIS, we must make a “pragmatic judgment whether the EIS’s form, content and preparation foster both informed decision-making and informed public participation.” Block, 690 F.2d at 761 (emphasis added).

. To the extent that the Park Service may have assumed a contractual duty to assist the BLM, the Charpieds cannot demonstrate that they are third party beneficiaries.