**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALASKA SURVIVAL; SIERRA CLUB; COOK INLETKEEPER,<br><br>*Petitioners*,<br><br>v.<br><br>SURFACE TRANSPORTATION BOARD; UNITED STATES OF AMERICA,<br>*Respondents*,<br><br>ALASKA RAILROAD CORPORATION; MATANUSKA-SUSITNA BOROUGH; STATE OF ALASKA,<br>*Respondents-Intervenors*. | No. 12-70218<br><br>STB No.<br>FD-35095<br><br>OPINION |

On Petition for Review of an Order of the
Surface Transportation Board

Argued and Submitted
November 8, 2012—San Francisco, California

Filed January 23, 2013

Before: Ronald M. Gould and Milan D. Smith, Jr., Circuit Judges, and Kevin Thomas Duffy, District Judge.[*]

Opinion by Judge Gould

---

## SUMMARY[**]

---

### Surface Transportation Board

The panel denied a petition for review challenging the Surface Transportation Board's decision authorizing Alaska Railroad Corporation to construct a railroad line extension between Port MacKenzie and Wasilla, Alaska.

The Surface Transportation Board granted the Corporation an exemption under 49 U.S.C. § 10502 of the Interstate Commerce Commission Termination Act of 1995 and authorized the Corporation to construct the rail line. Petitioners challenged the Board's authority to exempt the Corporation from the full licensing provision of 49 U.S.C. § 10901, and the Board's compliance with the National Environmental Policy Act.

The panel held that petitioners were not procedurally barred from raising their challenge to the exemption under 49 U.S.C. § 10502 of the ICCTA. The panel further held that

---

[*] The Honorable Kevin Thomas Duffy, United States District Judge for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the procedures of the Board under the ICCTA were sufficient and were satisfied. The panel also held that there was no error under the National Environmental Policy Act because the purpose and need statement was adequate; the agency considered all viable, reasonable alternatives; and the environmental impact statement contained a detailed, thorough, and thoughtful discussion of the wetlands impacts and mitigation measures.

## COUNSEL

James B. Dougherty (argued), Washington, D.C.; Jessica Yarnall Loarie, Sierra Club, San Francisco, California for Petitioners.

Theodore L. Hunt (argued), Raymond A. Atkins, Evelyn G. Kitay, Surface Transportation Board, Washington, D.C.; Mary Gabrielle Sprague, Robert B. Nicholson, and John P. Fonte, Department of Justice, Washington D.C., for Respondents.

Jay C. Johnson (argued) and Kathryn Kusske Floyd, Dorsey & Whitney LLP, Washington D.C., for Respondents-Intervenors Alaska Railroad Corporation and Matanuska-Susitna Borough.

Michael C. Geraghty and Sean P. Lynch, State of Alaska, Department of Law, Juneau, Alaska for Respondent-Intervenor the State of Alaska.

## OPINION

GOULD, Circuit Judge:

In this appeal we consider whether principles of administrative law and a controlling statute governing railroad extensions and applicable protections of environmental laws require us to grant a petition for review of a specialized agency's decision to permit the extension of a railroad line to Port MacKenzie, Alaska. Petitioners Alaska Survival, Sierra Club, and Cook Inletkeeper seek review of the Surface Transportation Board's (STB) decision authorizing Alaska Railroad Corporation (ARRC) to construct about thirty-five miles of new rail line between Port MacKenzie, located in Alaska's Cook Inlet, and the railroad's main line, located near Wasilla, Alaska. The STB granted ARRC an exemption under 49 U.S.C. § 10502 of the Interstate Commerce Commission Termination Act of 1995 (ICCTA) and authorized ARRC to construct the rail line. Petitioners challenge the STB's authority to exempt the railroad from the full licensing provisions of 49 U.S.C. § 10901 and the agency's compliance with the National Environmental Policy Act (NEPA). Respondents claim that Petitioners did not administratively exhaust the issue of whether the STB properly granted the exemption and that the issue is not properly before us. We have jurisdiction under 28 U.S.C. §§ 2321(a), 2342(5), and 2344, and we deny the petition for review.

## I. PARTIES

We first identify the parties. Petitioners Alaska Survival, Sierra Club, and Cook Inletkeeper are nonprofit organizations dedicated to protecting wild lands, waters, and wildlife in

Susitna Valley and the Cook Inlet watershed.  Respondent STB is a federal agency with exclusive licensing authority for the construction and operation of new rail lines. Respondents-Intervenors are the State of Alaska, a financial supporter of the project; the ARRC, a public corporation partially owned by the State of Alaska that will build and operate the railroad; and the Matanuska-Susitna Borough, the owner and operator of the Port MacKenzie dock and adjacent uplands.

## II.  FACTUAL BACKGROUND

We next review the factual background.  ARRC seeks to build and operate thirty-five miles of rail line connecting Port MacKenzie, located 1.5 miles across the Cook Inlet from the Port of Anchorage, to ARRC's main line near Wasilla.  The proposed rail line would consist of a single-track rail line with a two-hundred-foot-wide right of way, buried utility lines, an access road, communication towers, and a terminal reserve area.  The purpose of the rail line is to "provide rail service to Port MacKenzie and to connect it with the existing ARRC main line, providing Port MacKenzie customers with rail transportation between Port MacKenzie and Interior Alaska."  The proposed rail line will pass through the waters and wetlands of the Susitna Lowland that provides a home to wolves, bear, foxes, salmon, and other wildlife.

In February 2008, the STB's Office of Environmental Analysis (OEA) initiated the Environmental Impact Statement (EIS) public scoping process in anticipation of

ARRC's request for authorization to construct the rail line.[1] ARRC filed its § 10502 petition in December 2008, requesting an exemption from the full licensing procedures required under 49 U.S.C. § 10901.  OEA released the draft EIS (DEIS) in March 2010.  Elected officials, organizations, citizens, and various agencies submitted around 160 comments on the DEIS.  The final EIS (FEIS) was released in March 2011.  It recommended that ARRC employ one hundred mitigation measures to reduce environmental impacts but acknowledged that even with mitigation, construction of the rail line would increase erosion and sediment transport to water, cause nutrient loading, and likely leak petrochemicals to nearby waters.  Construction would also lead to loss of wetland habitat, water degradation, and potentially a change in the hydrology of the wetland system. The FEIS identified the Mac East Variant-Connector 3 Variant-Houston-Houston South Alternative as the environmentally preferable alternative for the proposed line.

OEA did not request comment on the FEIS, but the Environmental Protection Agency (EPA), the Alaska Department of Natural Resources (ADNR), Sierra Club, and several citizens submitted comments noting various deficiencies.  For example, the EPA expressed concern that the purpose and need statement did not contain sufficient information on the project's need or public necessity.  In response to these and other concerns, the OEA prepared an Environmental Memorandum (EM) addressing the post-FEIS

---

[1] The agency conducted this public scoping process before ARRC filed its application, indicating that ARRC "plan[ned]" to file its petition for exemption under § 10502. The Alaska Railroad Corporation—Petition for Exemption To Construct and Operate a Rail Line Extension to Port MacKenzie, AK, 73 Fed. Reg. 8106-01 (Feb. 12, 2008).

comments and concluding that a supplemental EIS was not necessary.

After reviewing the entire environmental record, including the FEIS, the EM, and public comments, the STB issued a 2:1 decision on November 17, 2011, granting the § 10502 exemption and authorizing the rail line. The STB determined first that an exemption was appropriate because it was consistent with parts (2), (4), (5), and (7) of the transportation policy and second that full consideration under § 10901 was not necessary to protect shippers from abuse of market power. The STB concluded that the record showed that the EIS took a "hard look" at the potential environmental impacts of the proposed action and that it carefully considered alternatives to the planned action. The STB then adopted all of the OEA's environmental review and conclusions, authorized construction of the environmentally preferable alternative, and imposed on ARRC the one hundred mitigation measures recommended by OEA to address the project's adverse impacts on surface waters, wetlands, fisheries, and recreational trail access. Commissioner Mulvey dissented from the STB's decision based on "the [project's] likely substantial adverse impact on the environment and the poor showing of a purpose and need for the line" and on his belief that the project is not in the public interest.

Petitioners seek review of the STB's decision.[2]

---

[2] In an October 1, 2012, Order, we granted Petitioners' emergency motion for a stay pending the merits panel's review of the STB order. Order, *Alaska Survival v. Surface Transp. Bd.*, No. 12-70218 (9th Cir. Oct. 1, 2012). After full briefing and oral argument, we lifted that emergency stay in an order published November 28, 2012, concluding that the

## III.  STATUTORY FRAMEWORK

Before reaching the merits, we consider the statutory framework relevant to this petition for review.

### A.  ICCTA

The ICCTA amended existing railroad statutes, replaced the Interstate Commerce Commission (ICC) with the STB, and provided that ICC precedent applies to the STB. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1073 n.2 (9th Cir. 2011) [hereinafter *NPRC*]; Pub. L. No. 104–88, 109 Stat. 803 (1995) (codified at 49 U.S.C. §§ 10101–16106 (2012)).  Under 49 U.S.C. § 10901, the "Board has exclusive licensing authority for the construction and operation of new railroad lines" and may certify rail line construction and operation unless the STB finds the project to be "inconsistent with the public convenience and necessity." *NPRC*, 668 F.3d at 1073.  To determine public convenience and necessity, the STB looks at a "variety of circumstances" surrounding the proposed action, which can include consideration of the applicant's financial fitness, the public demand or need for the service, and the potential harm to competitors. *See id*. at 1092 (quoting *N.M. Navajo Ranchers Ass'n v. Interstate Commerce Comm'n*, 702 F.2d 227, 232 (D.C. Cir. 1983)).  As an alternative to the detailed

---

balance of hardships no longer tipped in favor of Petitioners.  Order, *Alaska Survival v. Surface Transp. Bd.*, No. 12-70218, 2012 WL 5951297 (9th Cir. Nov. 28, 2012).

§ 10901 procedures, 49 U.S.C. § 10502[3] provides that the STB

> shall exempt a person, class of persons, or a transaction or service whenever the Board finds that the application in whole or in part of a provision of this part – (1) is not necessary to carry out the transportation policy of section 10101 of this title;[4] and (2) either –

---

[3] The ICCTA renumbered various provisions of the Interstate Commerce Act, including § 10502, which was formerly codified under 49 U.S.C. § 10505. *See United Transp. Union v. Burlington N. Santa Fe R.R. Co.*, 528 F.3d 674, 677 n.2 (9th Cir. 2008).

[4] The ICCTA specifies that the fifteen objectives of the Rail Transportation Policy are:

> (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail; (2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required; (3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Board; (4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense; (5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes; (6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital; (7) to reduce regulatory barriers to entry

(A) the transaction or service is of limited scope; or (B) the application in whole or in part of the provision is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 10502 (2012). "Obtaining an exemption streamlines the regulatory process by eliminating notice and comment in some cases, by making a hearing unnecessary, and by expediting the final decision." *Vill. of Palestine v. Interstate Commerce Comm'n*, 936 F.2d 1335, 1337 (D.C. Cir. 1991).

---

into and exit from the industry; (8) to operate transportation facilities and equipment without detriment to the public health and safety; (9) to encourage honest and efficient management of railroads; (10) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability; (11) to encourage fair wages and safe and suitable working conditions in the railroad industry; (12) to prohibit predatory pricing and practices, to avoid undue concentrations of market power, and to prohibit unlawful discrimination; (13) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information; (14) to encourage and promote energy conservation; and (15) to provide for the expeditious handling and resolution of all proceedings required or permitted to be brought under this part.

49 U.S.C. § 10101 (2012).

## B.  NEPA

"The National Environmental Protection Act of 1969, commonly known as NEPA, is 'our basic national charter for protection of the environment.'"  *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1131 (9th Cir. 2011) (quoting 40 C.F.R. § 1500.1(a) (2006)).  "NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences" of major federal action.  *Id.* (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003)).  "For any proposed major federal action . . . NEPA requires the agency to prepare an [EIS]."  *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2004).  An EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

The Council on Environmental Quality has promulgated regulations governing the implementation of NEPA.  *See* 40 C.F.R. §§ 1500.1–1508.28.  The STB has also promulgated its own regulations governing how NEPA applies to railroad construction projects.  *See NPRC*, 668 F.3d at 1072 (regulations codified at 49 C.F.R. §§ 1105.1–1105.12). Under these regulations, the OEA generally prepares an EIS for new railroad construction proposals.  49 C.F.R. § 1105.6(a) (2012).  The STB invites public comment on the scope of the environmental review and on the DEIS.  49 C.F.R. § 1105.10(a) (2012).  The FEIS should discuss the comments received on the DEIS and note any changes made in response to them.  *Id.*  When determining whether to authorize a construction project, the STB considers the environmental record, which includes the FEIS and any

comments and responses concerning environmental issues. 49 C.F.R. § 1105.10(f); *see also NPRC*, 668 F.3d at 1073.

## C.  APA

Judicial review of agency action is governed by § 706 of the Administrative Procedure Act (APA).  5 U.S.C. § 706 (2012); *see also NPRC*, 668 F.3d at 1074.    Under § 706(2)(A), we will uphold an agency's action unless it is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *NPRC*, 668 F.3d at 1074 (quoting 5 U.S.C. § 706(2)(A)).  Agency action is arbitrary and capricious if  "'the record plainly demonstrates that [the agency] made a clear error in judgment.'"  *Id.* at 1075 (quoting *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Natural Res. Def. Council*, *Inc.*, 555 U.S. 7 (2008)).  We limit our review of agency action to the record, and we will not substitute our judgment for that of the agency.  *See id.* at 1074–75 (citing *McNair*, 537 F.3d at 987).  Section 706 controls our review of both the STB's grant of the § 10502 exemption and the STB's actions pursuant to NEPA.  *See id.* at 1074, 1076.

## IV.  DISCUSSION

Petitioners argue that the STB improperly exempted the proposed rail line from the procedural requirements of § 10901.  Before we reach that issue, we must first address whether it is properly before us.    Respondents and Respondents-Intervenors ARRC  and  Matanuska-Susitna Borough assert that it is not.  They contend that Petitioners did not raise the issue of the agency's use of the exemption "at the appropriate time under the agency's practice," and that

this failure to exhaust prevents us from deciding these issues now.  Petitioners respond that the Supreme Court's plurality decision in *Sims v. Apfel*, 530 U.S. 103 (2000), makes issue exhaustion requirements inapplicable here.  We conclude that Petitioners are not procedurally barred from raising their challenge to the § 10502 exemption.

"The purpose of the exhaustion doctrine is to permit administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention in the process."  *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010).  But in *Sims*, the Supreme Court indicated that judicially created issue exhaustion is not always appropriate.  *Sims*, 530 U.S. at 112.  The Court considered whether a person claiming Social Security benefits waived judicial review of issues not raised before the agency's appeals council.  *Id*. at 104–05.  A plurality determined that when neither statute nor regulation requires issue exhaustion, judicially created issue exhaustion is inappropriate where the administrative proceeding was informal and "inquisitorial rather than adversarial," and the claimant exhausted administrative remedies.  *Id*. at 108, 111, 112.  Justice O'Connor concurred, noting that the issue exhaustion "inquiry requires careful examination of 'the characteristics of the particular administrative procedure provided.'"  *Id*. at 113 (O'Connor, J., concurring) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)).  Similarly, we have noted that "there is no bright-line test to determine whether a party has properly exhausted a claim to the [agency]; the determination must be made on a case-by-case basis."  *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010).  And it is a clear rule in our court "that the exhaustion requirement should be interpreted broadly."  *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*,

606 F.3d 1058, 1065 (9th Cir. 2010) [hereinafter *NPCA*]. Because neither statute nor regulation required issue exhaustion in this matter, we must consider whether judicially imposed issue exhaustion is appropriate here.

We have applied *Sims* in the adjudicatory context, *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620 (9th Cir. 2008), but determined that *Sims* "offers no guidance" in the notice-and-comment rulemaking context, *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1020 (9th Cir. 2004). Neither case is directly on point. Although the STB conducts rulemaking when it grants an exemption, *see CMC Real Estate Corp. v. Interstate Commerce Comm'n*, 807 F.2d 1025, 1030 (D.C. Cir. 1986), *Universal Health Services* is distinguishable because it addresses notice-and-comment rulemaking, which is not generally employed by the STB during the exemption process. *See* 49 C.F.R. § 1121.4(a) (2012) (stating that the "[e]xemption proceedings are informal, and public comments are generally not sought during consideration of exemption petition proposals"). Although the adjudicatory nature of the ERISA proceeding distinguishes *Vaught* from the STB's grant of the exemption, *Vaught* is instructive because it concludes that when an agency engages in a non-adversarial, informal proceeding and does not provide notice of issue exhaustion requirements, then judicially created issue exhaustion is likely inappropriate. 546 F.3d at 631–33. Similarly, the STB's procedures were informal and provided no notice to interested parties that to later challenge the STB's decision one must submit comments during the exemption process. In other cases, the STB, or its predecessor the ICC, explicitly requested public comment on exemptions. *See, e.g.*, *Or. Public Util. Comm'n v. Interstate Commerce Comm'n*, 979 F.2d 778, 779 (9th Cir. 1992)

[hereinafter *OPUC*] (noting that the ICC granted an exemption subject to public comment); *Ill. Commerce Comm'n v. Interstate Commerce Comm'n*, 787 F.2d 616, 622 (D.C. Cir. 1986) (stating that the ICC issued a notice proposing a blanket exemption).[5]

Respondents argue that Petitioners should have commented on the exemption during the EIS process, but the record does not show that the STB ever said that was the appropriate time in which to raise issues with the exemption process. Although the STB published notice of its EIS proceedings, which included reference to ARRC's § 10502 application, it never provided direct notice of or requested public comment on the exemption. *See, e.g.*, The Alaska Railroad Corporation—Petition for Exemption To Construct and Operate a Rail Line Extension to Port MacKenzie, AK, 73 Fed. Reg. 8106-01 (Feb. 12, 2008). Further, the agency has stated that it does not usually rely on comments to frame issues for its review of exemption petitions. *See* Modification of Procedure for Handling Exemptions Filed Under 49 U.S.C. 10505, 45 Fed. Reg. 85180-02 (Dec. 24, 1980) (stating that "[c]omments have added very little to [the ICC's]

---

[5] Respondents do not contend that Petitioners failed to exhaust their administrative remedies, *see* 49 C.F.R. § 1115.6 (stating that a party must exhaust administrative remedies before going to court), but only that they failed to raise the issue of the STB's grant of the § 10502 exemption before the STB, *see Sims*, 530 U.S. at 107 (distinguishing exhaustion of administrative remedies from issue exhaustion). Although Petitioners could have filed a petition for reconsideration of the STB's decision, *see* 49 C.F.R. § 1121.4(e), they were not required to do so, *see* 49 U.S.C. § 722(c)(d) (stating that parties may petition to reopen and reconsider an STB action or seek judicial review); 49 C.F.R. § 1115.3 (same); *see also* 5 U.S.C. § 704 (stating that actions are final for purposes of review whether or not a request for reconsideration has been presented).

determination of exemption petitions"); *cf. Sims*, 530 U.S. at 112 (stating that the Social Security Appeals Council "does not depend much, if at all, on claimants to identify issues for review"). Because this administrative process lacks an adversarial component, "the reasons for [us] to require issue exhaustion are much weaker." *Sims*, 530 U.S. at 110.[6]

Based on the informal nature of these proceedings and the lack of notice to interested parties of the "appropriate time" in which to raise their objections to the agency's decision to apply the § 10502 exemption, we conclude that the question of whether the STB violated 49 U.S.C. §§ 10901 or 10502 in granting the exemption for the Port MacKenzie rail line is properly before us.

## A.  ICCTA Exemption From Public Convenience and Necessity Review

Petitioners contend that the STB did not properly apply the standards set forth in §§ 10502 and 10901 when it granted ARRC's application for an exemption to construct the proposed rail line. They challenge the STB's decision not to

---

[6] The D.C. Circuit has likewise refused to apply issue exhaustion in the rulemaking context when petitioners were unable to administratively raise their argument challenging lack of notice before the STB issued its final rule. *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009). We note that the Eighth Circuit has applied judicially imposed issue exhaustion to a challenge to an STB decision. *See Otter Tail Power Co. v. Surface Transp. Bd.*, 484 F.3d 959, 962 (8th Cir. 2007). But that decision is inapposite because the underlying administrative proceeding was adversarial in nature. *See id.* at 961–62, 963 (describing that both Otter Tail and the Burlington Northern Santa Fe Railway presented briefing and other information to the STB in a dispute over the reasonableness of shipping rates).

consider the public convenience and necessity of the project and the STB's assessment of the transportation policy under § 10101. We hold that it was not arbitrary, capricious, an abuse of discretion, or contrary to law for the STB to grant ARRC an exemption under § 10502 from the full licensing procedures required by § 10901. We further hold that substantial evidence supports the STB's findings favoring its grant of the exemption.

Section 10502(a) states that the STB "shall" grant an exemption from a provision of the statute if (1) application of that provision is not necessary to carry out the transportation policy and (2) the transaction is of limited scope or the application of the full statutory procedures is not needed to protect shippers from abuse of market power. 49 U.S.C. § 10502(a). This exemption procedure reflects Congress's "determination that there be continuing evaluation of the appropriateness of regulation and continuing deregulation where consistent with the Act's policies." *Coal Exps. Ass'n of the U.S., Inc. v. United States*, 745 F.2d 76, 82 (D.C. Cir. 1984). Section 10901 sets forth a more detailed procedure for authorizing construction and operation of rail lines, which requires a determination that the activities are consistent with the public convenience and necessity. 49 U.S.C. § 10901(a)–(c).

We review the STB's statutory construction of the ICCTA under *Chevron U.S.A., Inc. v. Nat. Res. Defense Council*, 467 U.S. 837 (1984). *See NPRC*, 668 F.3d at 1075–76. "First, we inquire whether Congress has addressed directly the issue before the court," and if so, "the agency 'must give effect to the unambiguously expressed intent of Congress.'" *Id*. (quoting *Chevron*, 467 U.S. at 842–43). If Congress has not unambiguously addressed the specific issue before us,

then we must determine whether the agency's construction of the statute is permissible. *Id*. at 1076.

Petitioners' argument that we should review the STB's action pursuant to the standards set forth in § 10901 lacks merit. Petitioners rely on vague extra-circuit precedent to argue that when the STB grants a § 10502 exemption "it summarily issues a certificate of public convenience and necessity" as required under § 10901. *HolRail, LLC v. Surface Transp. Bd.*, 515 F.3d 1313, 1315 (D.C. Cir. 2008) (reviewing an STB decision concerning a railway's right to cross another railway's right of way). They contend that *HolRail* should be read to mean that the STB should have performed a full § 10901 analysis of public convenience and necessity. Petitioners also assert that the STB erred in not analyzing the public convenience and necessity of the proposed rail line when the project's financial viability was called into question. These arguments are not persuasive. We do not read *HolRail* as requiring that the STB engage in a public convenience and necessity analysis before granting an exemption from that very procedure. Such a conclusion would run contrary to the plain language of § 10502(a), which mandates that the STB grant exemptions from the full proceedings required under the statute. *See* 49 U.S.C. § 10502(a). Further, neither § 10502 nor the STB's implementing regulations indicate that an exemption proceeding is improper when the project's financial viability is questioned. It might be argued with some force that it is not the best practice to employ the exemption process for a contentious project, but that is for the agency and not us to decide. *See City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997) (stating that the court should not substitute its judgment for that of the agency).

Petitioners also argue that the STB does not have authority to exempt a project as large as the proposed spur. This argument misreads the statute.  Section 10502(a)(2) allows the STB to grant an exemption if the project is either of limited scope *or* the full statutory proceedings are not necessary to protect shippers from abuse of market power. 49 U.S.C. § 10502(a)(2).  The plain language of the statute does not require the STB to consider both factors.  Here, the STB chose to analyze the project's impact on shippers instead of its scope.   Because the STB concluded that the full statutory proceedings were not necessary to protect shippers from abuse of market power, the STB had no duty to consider whether the project was of limited size.   The STB acted within its authority when it applied the analysis required by § 10502(a) without considering the public convenience and necessity under § 10901.

Petitioners also contend that the STB did not consider relevant parts of the fifteen-part Rail Transportation Policy and that for those factors considered the STB failed to explain how the record supported its findings.  We disagree.  The STB did not act arbitrarily or capriciously in determining the applicable sections of the Rail Transportation Policy set out in § 10101, and substantial evidence supports the STB's findings for those factors considered.

"When the [STB] grants an exemption from a portion of the Interstate Commerce Act, the [STB] needs to take into account only the purpose of that portion of the statute from which exemption is granted."  *OPUC*, 979 F.2d at 781. Stated another way, "[t]he scope of the [STB's] review in an exemption proceeding" is a "function of the relationship between the section from which an exemption is sought," here § 10901, and the Rail Transportation Policy enumerated

in § 10101.  *Vill. of Palestine*, 936 F.2d at 1338–39 (internal quotations omitted).  This rule ensures that the STB will not be "faced with the impossible task of reconciling a variety of different objectives of the [Rail] Transportation Policy." *OPUC*, 979 F.2d at 781.  "[T]he [STB] need not explicitly discuss in its decision each factor enumerated . . . . All that is necessary is that the essential basis of the [STB]'s rationale be clear enough so that a court can satisfy itself that the [STB] has performed its function." *Coal Exps.*, 745 F.2d at 94 n.22 (quoting *Alamo Express, Inc. v. Interstate Commerce Comm'n*, 673 F.2d 852, 860 (5th Cir. 1982)).

The STB did not act arbitrarily by failing to consider additional policy factors.  Petitioners contend that the STB should have considered three additional factors: (3) promoting "a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Board," (9) encouraging "honest and efficient management of railroads," and (14) encouraging and promoting energy conservation.   49 U.S.C.  § 10101. Petitioners do not show how these factors relate to the purpose of § 10901.   Such a showing would make it necessary for the STB to consider those provisions.  *See OPUC*, 979 F.2d at 781.  Nor do they show that the STB's interpretation of which factors are relevant to the purpose of § 10901 is an unreasonable interpretation of the statute.

Petitioners claim that *Illinois Commerce Commission* and *Coal Exporters* impose a heavy burden on the STB to identify all the relevant policies furthered by an exemption.  But the STB does not have a duty to make "findings about each aspect of the rail transportation policy possibly affected" by its grant of the exemption. *Vill. of Palestine*, 936 F.2d at 1339.  To require such analysis would make the exemption

process "broader and possibly more onerous than the proceeding from which exemption was sought." *Id*. Petitioners also contend that *Illinois Commerce Commission* and *Coal Exporters* show that the STB is not entitled to "wide deference" in choosing which factors of the policy apply. Such an assertion runs contrary to our standard of review under the APA. *See NPRC*, 668 F.3d at 1076 (stating that the STB's decision on railroad application approvals must be upheld unless arbitrary, capricious, an abuse of discretion, or not in accordance with law). We conclude that the STB's decision to consider only factors (2), (4), (5), and (7) was reasonable.

Likewise, the STB provided sufficient findings supporting its consideration of factors (2), (4), (5), and (7). The STB explained that the record supported its conclusion that construction would be consistent with factors (4), ensuring the development and continuation of a sound rail transportation system, and (5), fostering sound economic conditions in transportation and ensuring effective competition and coordination between rail carriers and other modes. The STB noted that the rail line would be more efficient than truck transportation and would enhance intermodal competition by providing an alternative to freight to meet the needs of shippers. Further, the EIS discussed the economic and transportation benefits of the rail line.

The STB also found that the exemption would reduce the need for federal regulation and decrease regulatory barriers to entry in support of factors (2), minimizing the need for Federal regulatory control, and (7), reducing regulatory barriers. These findings are reasonable when the exemption made it unnecessary for ARRC to go through otherwise lengthy regulatory procedures under § 10901. The STB's

explanations are sufficient for us to determine the STB's rationale and satisfy ourselves that the STB performed its function as required by the statute. *See Coal Exps.*, 745 F.2d at 94 n.22. We conclude that substantial evidence supports the agency's findings. *See In re Transcon Lines*, 89 F.3d 559, 564 (9th Cir. 1996) (describing the substantial evidence standard).

## B. NEPA

Petitioners raise a second issue of whether the STB's EIS complied with NEPA. They contend that the STB violated NEPA by adopting an unreasonable purpose and need statement, refusing to consider an alternative route without an access road, and inadequately assessing the project's adverse effect on wetlands. We disagree.

### 1. Purpose and Need Statement

Petitioners argue that the STB erred by adopting a purpose and need statement focused exclusively on the goals stated by ARRC. They contend that the STB did not take into consideration public goals when defining the purpose and need. Respondents assert that the purpose and need statement properly focused on both the STB's enabling statute and ARRC's goals. We agree with Respondents, and we hold that the STB did not act arbitrarily or capriciously by generating the purpose and need statement based on the statutory context and ARRC's objectives.

A statement of purpose and need must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13 (2012). Courts

review purpose and need statements for reasonableness giving the agency considerable discretion to define a project's purpose and need. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004). A purpose and need statement will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained. *See NPCA*, 606 F.3d at 1070. "Where an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS." *Westlands Water Dist.*, 376 F.3d at 866. An agency must look hard at the factors relevant to definition of purpose, which can include private goals, especially when the agency is determining whether to issue a permit or license. *NPCA*, 606 F.3d at 1070–71.

Petitioners contend that the STB failed to articulate a purpose and need that reflected the agency's perspective. They argue that STB erred when it adopted ARRC's asserted goals without considering the "public convenience and necessity" under § 10901. Petitioners are correct that an agency must consider the statutory context of the proposed action and any other congressional directives in addition to a private applicant's objectives. *NPCA*, 606 F.3d at 1070; *see also League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1070 (9th Cir. 2012) (considering statutory context to determine reasonableness of purpose and need statement). But when granting a license or permit, the agency has discretion to determine the best way to implement its statutory objectives, *see Westlands Water Dist.*, 376 F.3d at 867, in light of the goals stated by the applicant, *see Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) ("Congress did not expect agencies to determine for the applicant what

the goals of the applicant's proposal should be."). We must consider whether the purpose and need statement is reasonable in light of the ARRC's stated goals and the statutory context of the ICCTA. *See NPCA*, 606 F.3d at 1070.

STB's statutory authorization to grant this exemption is found in 49 U.S.C. §§ 10101, 10502, and 10901. These provisions indicate that Congress intended to privilege interests of the applicant by requiring the STB grant § 10502 exemptions unless the exemption would be contrary to the Rail Transportation Policy, *see Coal Exps.*, 745 F.2d at 82, and by instructing the STB to authorize construction unless it would be inconsistent with the public convenience and necessity under § 10901, s*ee NPRC*, 668 F.3d at 1091–92. Even given their emphasis on construction and private interests, these sections also require some consideration of the public need for the project. *See id*. at 1092 (discussing STB's test for determining public convenience and necessity, which includes an analysis of "public demand or need"); *see also* 49 U.S.C. § 10101(4) (stating that it is part of the Rail Transportation Policy to ensure that the rail line system meets the needs of the public). But "public need" can be interpreted broadly, and the STB has discretion to determine which public needs it will consider. *See NPRC*, 668 F.3d at 1093–94 (concluding that the STB did not err by relying on support from farmers, coal producers, public utilities, and state officials to determine public need rather than the needs of shippers). Here, the purpose and need statement noted the State of Alaska's financial support of the project and Port MacKenzie's interest in a rail line to provide more efficient and cost-effective transport services to interior Alaska. Further, in its decision to grant the exemption, the STB connected ARRC's goals to its enabling statute, stating that

"ARRC's proposal to provide an additional freight transportation mode is consistent" with the relevant factors of the rail transportation policy.  We conclude that the STB "thought hard" about the appropriate factors, including its enabling statute and the applicant's needs, when it adopted the purpose and need statement.  *See Citizens Against Burlington*, 938 F.2d at 198.

Next, Petitioners argue that by "thoughtlessly adopt[ing]" ARRC's narrow goals, the STB considered an impermissibly narrow range of alternatives.  But Petitioners do not show that the STB's adoption of ARRC's goals led the agency to consider a too limited range of alternatives.  They do not demonstrate that the purpose and need statement resulted in the agency's failure to consider a non-access-road alternative nor do they point to any other deficiency in the alternatives considered in the FEIS.  *See Westlands Water Dist.*, 376 F.3d at 867–68 (reversing the district court's finding that the purpose and need statement was unreasonable when the statement did not improperly foreclose consideration of alternatives).  The FEIS considered twelve build alternatives and one no-action alternative.  The range of alternatives considered was sufficient to satisfy both the private and public objectives underlying the purpose of the project and to enable the STB to make an informed decision to grant the exemption.  *See City of Angoon v. Hodel*, 803 F.2d 1016, 1022 (9th Cir. 1986) (concluding that the EIS was adequate when the alternatives discussed enabled the agency to make an informed decision).

Petitioners also argue that there is no real need for this project.  They point to Commissioner Mulvey's dissent, which states that the purpose and need statement "relie[d] on little more than Port MacKenzie's aspirations for an increase

in traffic, a generalized goal to increase economic development, and the prospect of a new mode of transportation from the port." This argument ignores the people of Port MacKenzie and Matanuska-Susitna Borough's legitimate interest in a rail line connecting their side of the inlet to the main rail line, even if there are other ports in the area.[7] Further, the statement's aspirational quality does not mean that the rail line will not serve a purpose as a catalyst for economic development. We have a classic chicken-or-the-egg conundrum, and we are not convinced that the shippers must stand in line before there is sufficient need demonstrated for a rail line. It is not for us to decide which communities are entitled to important railroad development projects. That decision is committed in the first instance to the discretion of the agency authorized by Congress to approve rail line construction projects, the STB. Moreover, the quasi-public nature of the ARRC shows that its views about development of railroad lines in Alaska should have been given due weight by the STB.

We hold that the Statement of Purpose and Need reasonably defined the objectives of the project in light of both the applicant's objectives and the agency's statutory authorization.

---

[7] For example, the history of the Puget Sound area shows the vigor with which Seattle residents fought for a rail line linking them both to nearby resources and to the East Coast. Tacoma, located thirty miles south of Seattle, was chosen as the terminus of the Northern Pacific Railroad, but the close proximity of the port and rail line in Tacoma did not dull Seattle's desire and need for its own rail line. *See* Kurt E. Armbruster, *Orphan Road: The Railroad Comes to Seattle, 1853–1911*, at 51–58, 108 (Washington State University 1999).

## 2. No-Access-Road Alternative

Petitioners contend that the STB impermissibly refused to consider an alternative rail design without a full-length access road adjacent to the rail line.  They assert that a no-access-road alternative was a viable and reasonable option that should have been examined in the EIS.  Respondents assert that the STB properly determined that a no-access-road alternative was not reasonable because an access road is necessary for modern rail line construction and maintenance.  We conclude that the STB complied with NEPA when it determined that a no-access-road alternative was not feasible.

NEPA requires an EIS to describe and analyze "every reasonable alternative within the range dictated by the nature and scope of the proposal." *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998).  Consideration of alternatives "is the heart of the [EIS]," and agencies should "[r]igorously explore and objectively evaluate all reasonable alternatives" that relate to the purposes of the project and briefly discuss the reasons for eliminating any alternatives from detailed study.  40 C.F.R. § 1502.14 (2012); *see also Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1056 (9th Cir. 2011).  "The [EIS] need not consider an infinite range of alternatives, only reasonable or feasible ones." *Carmel-By-The-Sea*, 123 F.3d at 1155.  But failure to examine a reasonable alternative renders an EIS inadequate. *Friends of Southeast's Future*, 153 F.3d at 1065.  Those challenging the failure to consider an alternative have a duty to show that the alternative is viable. *City of Angoon*, 803 F.3d at 1021–22.

We perceive several flaws in Petitioners' contention that the agency acted arbitrarily and capriciously by refusing to

consider a no-access-road alternative. First, Petitioners merely contend but do not show that a no-access-road alternative is a feasible option that should have been considered by the STB. *Id*. Such an allegation begs the question of whether a no-access-road alternative is a feasible option. How could a railroad line effectively be built through rugged and undeveloped terrain without an access road for equipment and moving of supplies and personnel? Would a temporary access road cause more environmental harm in the Susitna wetlands than a permanent one? Without evidence to the contrary, we defer to the STB's technical expertise regarding modern railroad construction. *See NPRC*, 668 F.3d at 1075.

Second, Petitioners rely heavily on EPA's comments expressing concern about the need for an access road. They seem to argue that because the EPA called the necessity of an access road into question, the STB is obligated to consider a no-access-road alternative based on NEPA's mandate that STB consult with other agencies. They further contend that the concerns raised by the EPA and other agencies should reduce the deference we afford to the STB. But a lead agency does not violate NEPA when it does not defer to the concerns of other agencies. *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1146 (9th Cir. 2000). All that NEPA requires is that the lead agency consider these concerns and explain why it finds them unpersuasive. *Id*. The STB satisfied that burden here. Not only did the STB respond to EPA's concerns in the FEIS, it also addressed these concerns in its EM. We conclude that there is no error in STB's reliance on ARRC's explanation of modern railroad construction and maintenance practices to answer the EPA's concerns. It was reasonable for the STB to gather information about rail construction from the entity that will build the rail line.

Moreover, Petitioners cite no case law for their assertion that we should not give deference to the STB's decision. We conclude that STB did not act arbitrarily or capriciously in declining to consider the no-access-road alternative.

### 3.  Wetlands Delineation and Mitigation

Lastly, Petitioners contend that the STB relied on improper methodology for its wetlands delineation. Petitioners further argue that the EIS did not provide sufficient detail about the wetlands impacts of the rail line, leading to insufficient discussion of mitigation measures. Respondents counter that they employed accepted wetland-delineation methodology that yielded detailed information and that the discussion of wetlands mitigation in the FEIS was sufficient under NEPA. We agree with Respondents.

An EIS must contain a "reasonably complete discussion of possible mitigation measures." *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989)). "Mitigation must 'be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.'" *Carmel-By-The-Sea*, 123 F.3d at 1154 (quoting *Robertson*, 490 U.S. at 352). Perfunctory descriptions or mere lists of mitigation measures are insufficient. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

Petitioners take issue with the STB's use of "rapid assessment" survey methods, aerial photography, and computer generated information system data. They point to comments from both the National Marine Fisheries Service (NMFS) and the EPA that called for site-specific

examinations. Although we have held that the use of stale data based on aerial surveys does not constitute a "hard look" under NEPA, *NPRC*, 668 F.3d at 1086–87, we are not convinced that the STB's chosen methodology was deficient. Petitioners point to no evidence that the data was stale. Nor do they demonstrate how the methodology employed led to insufficient data on which to base mitigation measures. The record shows that the methodology used for wetlands delineation was performed in accordance with the Army Corps of Engineers' delineation manual. Although NMFS and EPA expressed concern with the wetlands delineation and the information on the functions of wetlands, the record does not show that the STB's reliance on this methodology was arbitrary and capricious. It is not the role of this court "to decide whether an [EIS] is based on the best scientific methodology available." *McNair*, 537 F.3d at 1003 (internal quotations omitted) (alterations in original). As long as the agency engages in a "reasonably thorough discussion," we do not require unanimity of opinion among agencies. *Carmel-By-The-Sea*, 123 F.3d at 1151 (internal quotations omitted).

Petitioners contend that the STB's analysis of wetland-damage mitigation is too cursory to meet NEPA's "hard look" requirement. They argue that the STB did not consider bridging streams and elevating track to minimize the need for filling of streams and wetlands as urged by the EPA. The STB responded to the EPA's concerns by explaining that the prohibitively high cost of constructing an elevated track makes it infeasible and discussing in the FEIS the positive and negative environmental impacts of bridges and culverts. The EM further addressed the EPA's concerns by reiterating the high costs of elevated track and noting that the EPA did not present any evidence that an elevated track was feasible.

Petitioners likewise present no evidence of the feasibility of the elevated track. We cannot say that failure to consider this alternative is improper without evidence showing the feasibility of the alternative. *City of Angoon*, 803 F.3d at 1021–22. Further, although we give special weight to criticism from other federal agencies, *see Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122 (9th Cir. 2004), the EPA's criticisms alone are not sufficient to invalidate the discussion of environmental impacts and mitigation measures that is found in the record. *See Carmel-By-The-Sea*, 123 F.3d at 1154–55.

Petitioners further argue that the STB impermissibly referred to mitigation measures as a "future prospect" to be handled by ARRC. NEPA does not require the finalization or adoption of mitigation measures but mandates only that the agency engage in a "reasonably thorough" discussion of mitigation. *Carmel-By-The-Sea*, 123 F.3d at 1151, 1154. The FEIS contains a lengthy discussion of measures to mitigate impacts on water resources, which includes removing debris from wetlands as soon as practicable and constructing the railroad to maintain natural water flows by installing bridges or using equalization culverts. Further, the STB's authorization of the exemption was conditional to ARRC's adoption of one hundred mitigation measures, including ensuring that bridges and culverts are designed and maintained in accordance with NMFS guidance and implementing best management practices to be imposed by the Army Corps of Engineers under the Clean Water Act § 404 permit, which ARRC must obtain before construction. Nothing about the discussion of mitigation measures is perfunctory. And we see no error in the STB's reliance on § 404's substantive requirements as mitigation measures when the agency otherwise complied with NEPA's

requirement of a reasonably thorough analysis. *See Carmel-By-The-Sea*, 123 F.3d at 1152.

## V.  CONCLUSION

We hold that the procedures of the STB under the ICCTA were sufficient and were satisfied and that there was no error under NEPA because the purpose and need statement was adequate; the agency considered all viable, reasonable alternatives; and the EIS contains a detailed, thorough, and thoughtful discussion of the wetlands impacts and mitigation measures.  Concluding that there was no violation of the ICCTA, NEPA, or the APA, we deny the petition for review.

**PETITION FOR REVIEW DENIED.**