**NOT FOR PUBLICATION**
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**FILED**

JAN 05 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| BACKCOUNTRY AGAINST DUMPS and DONNA TISDALE,<br><br>    Plaintiffs-Appellants,<br><br>v.<br><br>SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior; et al.,<br><br>    Defendants-Appellees,<br><br>OCOTILLO EXPRESS, LLC and PATTERN ENERGY GROUP, LP,<br><br>    Intervenor-Defendants-Appellees. | No.   13-57129<br><br>D.C. No.<br>3:12-cv-02211-GPC-PCL<br><br>MEMORANDUM* |

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Argued and Submitted November 3, 2015
Pasadena, California

Before:  FARRIS, BYBEE, and N.R. SMITH, Circuit Judges.

---

\*       This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Backcountry Against Dumps and Donna Tisdale ("Appellants") appeal the district court's order granting summary judgment in favor of Appellees. Appellants maintain that the Bureau of Land Management ("BLM") violated (1) the Federal Land Policy and Management Act ("FLPMA") in failing to comply with the California Desert Conservation Area ("CDCA") Plan, and (2) the National Environmental Policy Act ("NEPA") when it granted Ocotillo Express, LLC ("Ocotillo") a right of way to construct and operate the Ocotillo Wind Energy Facility ("OWEF Project" or "the Project") near Ocotillo, California. We may affirm a district court's grant of summary judgment "on any basis supported by the record." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1047 (9th Cir. 2009). Because the parties are familiar with the facts and procedural history of this case, we will not recount them here.

1. Appellants first contend the BLM violated the CDCA Plan by failing to determine whether the OWEF Project met the substantive requirements the Plan imposes on proposed uses of Class L land—the class of land upon which the OWEF Project is located. The CDCA Plan governs all land use activities within the CDCA. Because the OWEF Project is located on CDCA land, the BLM was required to ensure the Project complied with the Plan before granting the right-of-way. Significantly, the CDCA Plan includes a Plan amendment process that allows

2

the BLM to make changes to the CDCA Plan for a multitude of reasons, including accommodating a specific project that might not otherwise comply with the CDCA Plan. *See* BLM, California Desert Conservation Area Plan 1980, as amended, at 119 (Mar. 1999) [hereinafter CDCAP].

In the Record of Decision granting a right-of-way for the OWEF Project, the BLM adopted a Category 3 Plan amendment to accommodate the Project. *See* BLM, Record of Decision Ocotillo Wind Energy Facility and Amendment to the California Desert Conservation Area Plan, at 39 (May 2012). The BLM amended the CDCA Plan to designate the approximately 10,151 acres of public land where the Project was to be located as suitable for wind energy development. *Id.* at 1.

A Category 3 amendment "accommodate[s] a request for a specific use or activity [that] will require additional analysis" of its own. CDCAP, at 119. A Category 3 amendment, like a zoning variance, allows the BLM to carve out an exception to the CDCA Plan for a specific use or activity. *Id.* Once the BLM determines that a specific project warrants a Category 3 amendment, that project is no longer required to comply with the substantive requirements of the class of land on which the project is sited. Rather, the project is governed by the Plan amendment.

When considering a Category 3 amendment, the District Manager begins by evaluating the "additional analysis" specific to the use or activity for which the amendment is requested. *Id.* at 121. This additional analysis is generally an Environmental Impact Statement ("EIS"); therefore, a Category 3 amendment does not require its own EIS. *Id.* at 119, 121. If the District Manager approves, he or she recommends the amendment to the State Director. *Id.* at 121. If the State Director agrees, the District Manager renders a decision and issues a public notice of the amendment decision that clearly explains how the CDCA Plan would be changed by the amendment. *Id.* The BLM must then allow thirty days for the public to object to the amendment. *Id.* After resolving the objections, the BLM may approve the amendment. *Id.* The District Manager also has a series of six determinations and obligations that must be completed before the amendment can be approved. *Id.* The BLM substantially complied with this process.

Once the BLM adopted this Category 3 amendment to accommodate the OWEF Project, the Project was no longer required to comply with the multiple-use class designations, guidelines, or elements for Class L land. Therefore, even if we agree with Appellants that the BLM failed to determine whether the OWEF Project met the substantive requirements the Plan imposes on proposed uses of Class L land, we must nevertheless conclude that the Project did not violate the CDCA

4

Plan. The Project was governed by the Plan amendment rather than the Plan itself. Accordingly, we affirm the district court's grant of summary judgment finding that the BLM did not violate the CDCA Plan.

2. "NEPA requires agencies considering 'major Federal actions significantly affecting the quality of the human environment' to prepare and issue an environmental impact statement." *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1132 (9th Cir. 2007) (quoting 42 U.S. C. § 4332(2)(C)). An EIS must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. We review an EIS "to ensure that the agency has taken a 'hard look' at the potential environmental consequences of [a] proposed action." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004).

The BLM prepared and issued an EIS for the OWEF Project. Appellants contend that this EIS was inadequate, and thus violated NEPA, in four respects. First, Appellants argue that the BLM failed to take a "hard look" at the Project's impacts on peninsular bighorn sheep because there were no available studies demonstrating how the sheep would respond to wind turbines, and the BLM failed

to conduct its own independent study. Although both assertions are true, the BLM did consider a formal Endangered Species Act Section 7 consultation of the Project's impact on peninsular bighorn sheep, studies of bighorn sheep responses to other human activities, and a study of rocky mountain elk responses to wind turbine facilities. *See* BLM, Proposed Plan Amendment & Final Environmental Impact Statement/Final Environmental Impact Report for the Ocotillo Wind Energy Facility, at 1-15, 4.21-22, 4.21-43 (Feb. 2012) [hereinafter FEIS]. The EIS for the OWEF Project acknowledged that, although the Project would not directly affect the "critical habitat" of the peninsular bighorn sheep, the Project would temporarily impact 124.1 acres and permanently impact 43.1 acres of the of the "Essential Habitat" of the peninsular bighorn sheep. *Id.* at 4.21-8. The EIS also identified possible indirect impacts of the Project's construction and operation on the species. *See id.* at 4.21-20 to -22. The BLM sought to minimize and mitigate these impacts through the adoption of several different "Mitigation Measures," which require, *inter alia*, the BLM to monitor and collect data on the Project's impacts on the peninsular bighorn sheep, and to adjust its activities when appropriate and necessary. *See id.* at 4.21-43 to 4.21-51. Even though the actual effects the OWEF Project would have on the sheep were uncertain, we conclude the BLM took the requisite hard look, because it "considered extensively" the

potential impacts of the Project and the available mitigation measures. *See*

*Okanogan Highlands All. v. Williams*, 236 F.3d 468, 477 (9th Cir. 2000).

Second, Appellants argue the BLM violated NEPA by failing to consider the full visual impacts of the OWEF Project. Specifically, Appellants argue the BLM failed to analyze the visual impacts of the Project's electrical substation, utility switchyard, operations and maintenance facility, observation tower, and parking lot. It is true that the EIS focused on the visual impacts of the wind turbines, not on the Project's ancillary facilities. However, that analysis was permissible considering the visual impacts of the wind turbines would far exceed that of the ancillary facilities. *See* 40 C.F.R. § 1502.2(b) ("Impacts shall be discussed in proportion to their significance."). The EIS did discuss the visual impact of all the Project's facilities, from construction to operation to decommissioning, and discussed measures to mitigate these visual impacts. *See* FEIS, at 4.18. We conclude this discussion was sufficient under NEPA.

Third, Appellants argue that the BLM violated NEPA, because it failed to consider the health effects of the low-frequence noise ("LFN") and infrasound that would be produced by the wind turbines. In the EIS, the BLM acknowledged that experts are divided on the issue of whether exposure to LFN produced by wind turbines causes health problems. *Id.* at 5-53. The BLM then discussed the validity

7

of several studies on both sides of the debate. *See id.* at 4.11-13, 5-53 to 5-55, App. N at 180. The BLM rejected several studies based on their lack of supporting documentation or experimental flaws. *See id.* at 4.11-13, 5-53 to 5-55. The BLM found persuasive several studies that concluded the LFN and infrasound levels, which would be produced by the OWEF Project, would not cause health problems for the nearby residents. For example, the BLM found reliable and relevant a 2011 study that measured the LFN outside and inside homes near wind turbines, which were the same model as the turbines proposed for the OWEF Project. *Id.* at 5-53. The authors of the study "concluded that no adverse public health effects from LFN or infrasound would be expected from the types of turbines studied at distances greater than 300 m[eters]." *Id.* The BLM then concluded that the resulting LFN and infrasound that would be produced by the OWEF Project would be unlikely to cause health problems for the nearby residents because "the closest turbine is 804.67 m[eters] . . . from the nearest home." *Id.*

We find the BLM conducted a full analysis of the potential consequences of LFN and infrasound that would be produced by the Project and, based on the studies it found reliable, the BLM determined that the health effects would be minimal. Thus, the BLM took the requisite "hard look" at LFN and infrasound, and we will defer to the agency's position on this technical issue. *See Nat'l Parks*

8

*& Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 682 (9th Cir. 2000) (holding that when there are conflicting expert reports, an agency's "determination is due deference—especially in areas of agency expertise").

Fourth, and finally, Appellants argue that the EIS did not adequately discuss the reasonable alternatives to the OWEF Project, in part because the BLM drafted the purpose and need statement too narrowly. An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a). An EIS must also state the "purpose and need" of a project. *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). The "purpose and need" section of an EIS "dictates the range of 'reasonable' alternatives" that the agency must consider. *Id.* We "review purpose and need statements for reasonableness." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013). We give "agenc[ies] considerable discretion to define a project's purpose and need." *Id.* However, "an agency cannot define its objectives in unreasonably narrow terms." *Carmel-By-The Sea*, 123 F.3d at 1155. In drafting a purpose and need statement, "an agency must consider the statutory context of the proposed action," any applicable "congressional directives," and the "private applicant's objectives." *Alaska Survival*, 705 F.3d at 1085.

The BLM's framing of the purpose and need statement was reasonable. In the EIS, the BLM separately laid out its objectives and the distinct objectives of the Corps of Engineers, Ocotillo, and the State of California. FEIS, at 1-3 to 1-5. Within this discussion, the BLM noted relevant statutes, and congressional and executive directives. The BLM explained that the Proposed Project would assist it in addressing Executive Order 13212, the Energy Policy Act of 2005, Secretarial Order 3285A1, and the California Global Warming Solutions Act, all of which encourage, or mandate, the increased production of renewable energy. *Id.* Although the focus of the purpose and need statement was responding to Ocotillo's application, this was reasonable in light of the relevant statutes and directives and the wind resources available at the Proposed Project site.

Based on the purpose and need statement, the BLM initially considered eighteen alternatives to Ocotillo's Proposed Project, including other types of energy projects. *Id.* at 5-50; *see also id.* at 2-48 to 2-50. The EIS briefly explains why the alternatives energy projects were eliminated from consideration. *See id.* at 2-48 to 2-50. For example, a solar power project was eliminated both because it did not meet the purpose of harnessing wind energy, but also because the installation of solar panels would cause more land disturbance, which could have had a greater effect on cultural and biological resources than the Proposed Project.

10

*Id.* at 2-49. The BLM also considered other locations for the Project. *Id.* at 2-46.

These alternative sites were eliminated from consideration for a variety of reasons.

*Id.* Some of the sites had special designations that precluded them from use, such

as wilderness areas, some of the sites were already in use or had already been

proposed for other wind energy projects, and some of the sites had substantially

lower wind resources. *Id.* Ultimately, the BLM analyzed six alternatives in detail,

including the required "no project" alternative. We find that the BLM explored

and evaluated all reasonable alternatives to the Proposed Project based on a

reasonably drafted purpose and need statement. Accordingly, we find the BLM did

not violate NEPA.

**AFFIRMED.**



*Backcountry v. Jewell*, No. 13-57129 (Pasadena - November 3, 2015)

BYBEE, Circuit Judge, concurring in the judgment:

I respectfully disagree with the majority's decision to approve the Ocotillo Wind Energy Facility ("OWEF") because the BLM amended its California Desert Conservation Area Plan ("CDCA Plan"). In my view the BLM approved the OWEF project because it conformed to the CDCA Plan, not as a way of short circuiting our review.

Since 1980, the CDCA Plan has provided that wind energy generation facilities for this land classification "[m]ay be allowed after NEPA requirements are met." Here, the BLM did exactly what it was supposed to do. It prepared an exhaustive environmental impact statement. It carefully considered the impact that the proposed project would have on cultural and natural resources in the area and, in response, it reduced the footprint of the project. The BLM also acknowledged that it could not satisfy all of the competing claims to the land and, in an exercise of its judgment, it decided to approve the OWEF. Only after it had satisfied itself that it had heard from all interested parties, considered their views, followed the processes set forth in the CDCA Plan, and determined that the project conformed with the Plan's requirements, did the BLM amend the CDCA Plan. In my view, the BLM did not amend the CDCA Plan to avoid the Plan's requirements and this court's scrutiny under the APA; it amended the CDCA Plan to reflect that the

OWEF project was consistent with the Plan and to add OWEF to a list of approved energy development sites in the CDCA.  The BLM's careful and considered decision was model and is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

I concur in the judgment.