**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PROTECT OUR COMMUNITIES
FOUNDATION,
*Plaintiff*,

and

BACKCOUNTRY AGAINST DUMPS;
DONNA TISDALE,
*Plaintiffs-Appellants*,

v.

SALLY JEWELL, in her official
capacity as Secretary of the United
States Department of the Interior;
MIKE POOL, in his capacity as
Acting Director of the United States
Bureau of Land Management;
THOMAS ZALE, in his official
capacity as El Centro Field Office
Manager for the United States
Bureau of Land Management;
BUREAU OF LAND MANAGEMENT;
U.S. DEPARTMENT OF THE INTERIOR,
*Defendants-Appellees*,

TULE WIND, LLC,
*Intervenor-Defendant-Appellee.*

No. 14-55666

D.C. No.
3:13-cv-00575-
JLS-JMA

PROTECT OUR COMMUNITIES
FOUNDATION,

    *Plaintiff-Appellant*,

    and

BACKCOUNTRY AGAINST DUMPS;
DONNA TISDALE,

    *Plaintiffs*,

    v.

SALLY JEWELL, in her official
capacity as Secretary of the United
States Department of the Interior;
MIKE POOL, in his capacity as
Acting Director of the United States
Bureau of Land Management;
THOMAS ZALE, in his official
capacity as El Centro Field Office
Manager for the United States
Bureau of Land Management;
BUREAU OF LAND MANAGEMENT;
U.S. DEPARTMENT OF THE INTERIOR,

    *Defendants-Appellees*,

TULE WIND, LLC,

    *Intervenor-Defendant-Appellee.*

No. 14-55842

D.C. No.
3:13-cv-00575-
JLS-JMA

OPINION

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted April 6, 2016
Pasadena, California

Filed June 7, 2016

Before: JEROME FARRIS, TIMOTHY M.
TYMKOVICH,[*] and MILAN D. SMITH, JR., CIRCUIT
JUDGES.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[**]

### Environmental Law

The panel affirmed the district court's summary judgment in favor of federal agencies and officials and intervenor Tule Wind, LLC in an action challenging the Bureau of Land Management's decision to grant a right-of-way on federal lands in southeast San Diego County, permitting Tule Wind to construct and operate a wind energy project.

The panel held that the BLM was not liable under the National Environmental Policy Act, the Migratory Bird Treaty Act, the Bald and Golden Eagle Protection Act, or the Administrative Procedure Act for its regulatory decision to

[*] The Honorable Timothy M. Tymkovich, Chief Judge of the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

grant Tule a right-of-way to develop and operate a renewable wind energy project.

Specifically, concerning plaintiffs' allegations that the BLM failed to comply with the National Environmental Policy Act in preparing the environmental impact statement, the panel held that: the district court properly determined that the environmental impact statement's purpose-and-need-statement was adequately broad; the BLM acted within its discretion in dismissing alternative proposals; the mitigation measures provided ample detail and adequate baseline data for the agency to evaluate the overall environmental impact of the project; and the environmental impact statement took a "hard look" at the environmental impact of the project.

Concerning plaintiffs' allegations of BLM's violations of the Migratory Bird Treaty Act, the panel held that the Act did not contemplate attenuated secondary liability on agencies like the BLM that act in a purely regulatory capacity, and whose acts do not directly or proximately cause the "take" of migratory birds, within the meaning of 16 U.S.C. § 703(a). The panel concluded that the BLM did not act to "take" migratory birds without a permit within the meaning of the Act.

The panel held that the BLM's regulatory role in this case was too far removed from the ultimate legal violation to be independently unlawful under the Administrative Procedure Act.

Finally, for similar reasons that applied to defeat liability under the Migratory Bird Treaty Act, the panel held that the BLM was not liable under the Bald and Golden Eagle Protection Act, and was not responsible for violations that

might be independently committed by right-of-way grantees, such as Tule Wind.

## COUNSEL

Eric R. Glitzenstein (argued) and William S. Eubanks, II, Meyer Glitzenstein & Crystal LLP, Washington, D.C., for Plaintiff-Appellee Protect Our Communities Foundation.

Stephen C. Volker (argued), Jamey M.B. Volker, Marcus Eichenberg, and Stephanie Clark, Law Offices of Stephan C. Volker, Oakland, California, for Plaintiffs-Appellants/Plaintiffs-Appellees Backcountry Against Dumps and Donna Tisdale.

Allen M. Brabender (argued), John H. Martin, and Stacey Bosshardt, Attorneys; John C. Cruden, Assistant Attorney General; United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C.; for Defendants-Appellees.

Daniel P. Brunton (argued), Latham & Watkins LLP, San Diego, California, for Intervenor-Defendant/Appellee Tule Wind, LLC.

## OPINION

M. SMITH, Circuit Judge:

Protect Our Communities Foundation (Protect), Backcountry Against Dumps (Backcountry), and Donna Tisdale (collectively, Plaintiffs) appeal the decision of the Bureau of Land Management to grant Defendant-Intervenor Tule Wind, LLC, (Tule) a right-of-way on federal lands in southeast San Diego County. Plaintiffs named several federal defendants in this action, including the Bureau of Land Management (BLM), the Department of the Interior, and various officials of those agencies (collectively, Defendants).

The BLM's right-of-way grant permits Tule to construct and operate a wind energy project, which Plaintiffs claim will harm birds in violation of the Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703–12, and the Bald and Golden Eagle Protection Act (Eagle Act), 16 U.S.C. §§ 668–668d. In addition, Plaintiffs challenge the adequacy of the BLM's Environmental Impact Statement (EIS) for the project, which was prepared pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–70h. The district court rejected Plaintiffs' challenges and granted summary judgment to Defendants. We affirm.

## FACTS AND PRIOR PROCEEDINGS

### A. The Right-of-Way Grant

The BLM, which is an agency within the Department of the Interior, is charged with the management of federally owned land. *See* 43 U.S.C. §§ 1732(a), 1702(c). Among the BLM's responsibilities is the determination of whether to

grant rights-of-way for the use of such lands. *See id*. § 1761(a). Plaintiffs, which are a collection of environmental advocacy organizations and a local resident, challenge a right-of-way grant by the BLM that would permit Tule to construct and operate a wind energy facility on 12,360 acres of land in the McCain Valley, 70 miles east of San Diego (the Project).

Tule's original right-of-way proposal envisioned the construction of 128 wind turbines and supporting infrastructure, which could generate up to 200 megawatts of electricity. On December 23, 2010, the BLM released a lengthy draft EIS for public comment. The EIS discussed the environmental impacts of the Project and considered a range of alternative approaches.

Ultimately, the BLM decided to grant Tule a right-of-way for the development of a more modest wind-energy facility, which eliminated thirty-three of the originally proposed turbines from the Project. Moreover, in order to help reduce the risk of avian collisions with turbine blades, the approved Project repositioned several wind turbines that were originally proposed to be located on top of ridgelines. As modified, the Project was expected to generate up to 186 megawatts of electricity, thereby meeting the electrical energy needs of approximately 65,000 homes and businesses.

On October 3, 2011, the BLM released a final EIS reflecting these modifications. The agency published a Record of Decision (ROD) on December 19, 2011, memorializing its grant of a right-of-way for the Project. The ROD specified that the right-of-way grant would be issued for a thirty-year term, with an option to renew. It further provided that the grant of the right-of-way was expressly

conditioned on the "implementation of mitigation measures and monitoring programs," as well as "the issuance of all other necessary local, state, and Federal approvals, authorizations, and permits."

Included among the mitigation measures required for the Project was the Project-Specific Avian and Bat Protection Plan (the Protection Plan). Tule developed the Protection Plan in conjunction with the BLM and the U.S. Fish and Wildlife Service (FWS), which is the federal agency responsible for enforcing the MBTA and the Eagle Act. The Protection Plan was based on scientific literature and research studies, including field surveys conducted by Tule over several years in the Project area. Based on this information, the Protection Plan outlines a number of measures that would, if implemented, mitigate the impacts of the Project on bird and bat species.

The Protection Plan provides for continuous monitoring and inspection of the Project's environmental impacts on bird and bat species as part of an adaptive-management plan. The FWS endorsed the Protection Plan, stating that it was "appropriate in its adaptive management approach to avoid and minimize take of migratory birds, bats and eagles." Although the FWS advised that the Protection Plan was not a "take permit," it acknowledged that it could serve as the basis for a future permit application with the FWS. The BLM incorporated the Protection Plan by reference into the final EIS and conditioned its right-of-way grant on Tule's adherence to the mitigation measures described therein.

**B.  Procedural History**

Plaintiffs jointly brought an action in federal district court, challenging the BLM's issuance of a right-of-way grant to Tule, and seeking injunctive and declaratory relief under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06, to address Defendants' alleged unlawful actions under NEPA, the MBTA, and the Eagle Act. Tule intervened as a defendant in the lawsuit.

The parties filed cross-motions for summary judgment, and the district court granted Defendants' motion for summary judgment on all claims. Specifically, the district court held that the final EIS had sufficiently articulated a proposed goal and need for the Project, properly reviewed a number of alternatives, and proposed reasonable mitigation measures. The district court also held that the final EIS complied with NEPA by taking a "hard look" at the environmental impacts of the Project, including impacts such as noise and electromagnetic energy or stray voltage, as well as effects on avian species and greenhouse-gas emissions. Finally, the district court concluded that the BLM was not responsible for ensuring that it or Tule obtain MBTA and Eagle Act permits from the FWS prior to issuing its right-of-way grant.

Plaintiffs filed two separate notices of appeal from the district court's judgment, with Plaintiff Protect addressing the MBTA issue, and Plaintiffs Backcountry and Tisdale addressing all issues appealed. We consolidated these appeals from the district court's judgment.

## STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the district court's grant of summary judgment de novo. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003). Under the APA, we review agency action to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts in an "arbitrary and capricious" manner when it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In general, a court will "uphold agency decisions so long as the agencies have 'considered the relevant factors and articulated a rational connection between the factors found and the choices made.'" *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (quoting *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 953–54 (9th Cir. 2003)). This deference is particularly appropriate when a court is reviewing "issues of fact," "where analysis of the relevant documents requires a high level of technical expertise." *City of Sausalito*, 386 F.3d at 1206.

## DISCUSSION

## I.  The Environmental Impact Statement's Compliance with NEPA

NEPA, which provides the statutory framework for federal agencies reviewing the environmental effects of a

proposed action, requires the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must contain, among other things, a detailed discussion of "the environmental impact of the proposed action," "adverse environmental effects which cannot be avoided," "alternatives to the proposed action," and a statement of the purpose and need for the action. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.13.

NEPA outlines a series of procedural steps, but it does not impose any particular substantive result on an agency. *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000). Rather, compliance with NEPA involves the application of a "rule of reason," which involves "a pragmatic judgment whether the EIS's form, content, and preparation foster both informed decision-making and informed public participation." *Churchill Cty. v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001) (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)). Specifically, a reviewing court will take a "hard look" at the EIS to determine whether it "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.* at 1071–72 (quotation marks omitted). NEPA favors "coherent and comprehensive up-front environmental analysis to ensure . . . that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.* at 1072–73 (quotation marks omitted).

Plaintiffs allege that Defendants failed to comply with NEPA in a number of respects in preparing the EIS. *First*, Plaintiffs maintain that the scope of the Project's purpose and need statement was too narrow. *Second*, Plaintiffs argue that the EIS failed to adequately examine viable alternatives,

including a "distributed generation" alternative involving the use of rooftop solar panels. *Third*, Plaintiffs claim that the Project's proposed mitigation strategies are too vague and speculative to satisfy NEPA. *Finally*, Plaintiffs maintain that the EIS fails to take a "hard look" at the environmental impact of the Project in several distinct ways. Specifically, they note that the EIS omits a comprehensive discussion of the impacts of noise on bird species and fails to conduct a survey of nighttime migratory birds. In addition, Plaintiffs claim that the EIS does not fairly address the impacts of inaudible noise, electromagnetic fields, and stray voltage on humans, or the proposed consequences of the project on global warming. We address each of these arguments in turn.

## A.  Statement of Purpose and Need

An agency tasked with preparing an EIS must prepare a statement that "briefly specif[ies] the underlying purpose and need to which the agency is responding." 40 C.F.R. § 1502.13. This statement should inform the agency's review of alternatives to the proposed action and guide its final selection. We accord the agency "considerable discretion to define a project's purpose and need" and review such statements for reasonableness. *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013). However, a statement of purpose and need "will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained." *Id.* In a context, as here, where the agency is tasked with deciding whether to issue a permit or license, the statement of purpose and need may include "private goals" alongside statutory policy objectives. *Id.* at 1085. However, it is the statutory goal that "serve[s] as a guide by which to determine the reasonableness of the objectives outlined." *Id.* at 1084–85.

In this case, the district court properly determined that the EIS's purpose-and-need-statement was adequately broad, such that the agency's decision was not foreordained. The statement specified that:

> [T]he purpose and need for the proposed action is to respond to a [Federal Land Policy and Management Act (FLPMA)] right-of-way application submitted by Tule Wind, LLC . . . . In conjunction with FLPMA, the BLM's applicable authorities include the following:
>
> • Executive Order 13212 . . . which mandates that agencies act expediently and in a manner consistent with applicable laws to increase the production and transmission of energy in a safe and environmentally sound manner.
>
> • Section 211 of the Energy Policy Act of 2005 . . . which established a goal for the [DOI] to approve at least 10,000 megawatts of nonhydropower renewable energy power on public lands by 2015.
>
> • Secretarial Order 3285A1, [which] establishes the development of renewable energy as a priority for the DOI [and] announced a policy goal of identifying and prioritizing specific locations (study areas) best suited for large-scale production of solar energy.

The EIS's purpose-and-need statement reflects both the agency's immediate objective, "to respond" to Tule Wind's right-of-way request, as well as the broader policy goals that the agency considered in deciding among alternative proposals. This statement is fully consistent with the agency's duty to consider federal policies in fashioning its response to a right-of-way application, and constitutes a reasonable formulation of project goals. *See id*. at 1084. The purpose-and-need statement also permitted the agency to consider a range of alternatives to Tule's proposal, including one which it ultimately adopted in order to reduce the impact of the Project on the surrounding environment.

Although Plaintiffs also challenge the BLM's purported "need" for the action, the statement of need is adequately supported by the federal objectives outlined in the EIS. In particular, Section 211 of the Energy Policy Act of 2005 sets forth an agency goal of approving up to 10,000 watts of renewable energy development on public lands by 2015—a time frame which, the agency determined, would be most readily met through the development of a utility-scale energy project.

## B. Project Alternatives

Plaintiffs contend that the BLM dismissed viable alternative projects out of hand. Specifically, Plaintiffs challenge the BLM's decision to reject a "distributed generation" alternative, which would involve the use of rooftop solar panels. Having found the agency's statement of purpose and need to be reasonable, we also conclude that the BLM acted within its discretion in dismissing alternative proposals.

First, the range of alternatives considered in the EIS was not impermissibly narrow, as the agency evaluated all "reasonable [and] feasible" alternatives in light of the ultimate purposes of the project. *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). An agency need not review "remote and speculative" alternatives. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978)). Instead, its review is guided by a "rule of reason." *City of Carmel-by-the-Sea*, 123 F.3d at 1155. Accordingly, the EIS need only "briefly discuss" the reasons for eliminating an alterative not selected for detailed examination. 40 C.F.R. § 1502.14(a).

Here, the agency reviewed five action alternatives to the project originally proposed by Tule, as well as two no-action alternatives. The agency also briefly considered seven project-design alternatives and three energy-generation alternatives, including distributed generation. The distributed-generation alternative involved the use of rooftop solar panel systems on buildings in San Diego County and the development of other renewable-energy systems.

The BLM dismissed the distributed-generation alternative because it failed to satisfy the agency's goals and presented a number of feasibility challenges. First, the distributed generation alternative did not provide for utility-scale energy generation on public lands, and therefore would have been less effective at meeting the goals articulated by the agency. Although an agency is not limited to considering alternatives within its jurisdiction, the agency is not required to give exhaustive consideration to an alternative that it appropriately deems remote and speculative. *City of Angoon v. Hodel*,

803 F.2d 1016, 1021–22 (9th Cir. 1986) (alternatives "must be ascertainable and reasonably within reach"). In this case, the private installation and use of rooftop solar systems presented significant feasibility issues that the agency decided to take into account when choosing among alternative proposals.

Specifically, the BLM found the implementation of this alternative to be "speculative" given the current status of solar technology and the regulatory and commercial landscape. According to the BLM, the installation of at least 100,000 new rooftop solar units, primarily on private residential or commercial properties, would be required in order to match the energy generation from the original wind-energy proposal. Even if such an outcome were feasible, however, the BLM concluded that a project of such scale might require "extensive upgrading" of infrastructure and generate uncertain environmental impacts. These technical determinations of the agency, reflecting the application of its specialized expertise, merit particular deference on review. *See Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We thus find that the BLM reasonably concluded that the overall effectiveness of a distributed-generation alternative, reliant on private installation and technical upgrading, remained speculative in practice.[1] Similarly, Plaintiffs' final contention that the distributed-generation systems would present a cost-

---

[1] Plaintiffs highlight the fact that state legislation creating a system of renewable-energy trading credits was passed two months after the final EIS was issued. Notwithstanding this new development, the BLM acted reasonably because it based its determination of feasibility on a number of independently sufficient reasons discussed in the EIS.

effective alternative must be weighed against the feasibility of the overall approach and its consistency with agency goals. Considered as a whole, therefore, the BLM did not act unreasonably in dismissing the distributed-generation alternative.

### C.  Mitigation Measures

Pursuant to NEPA, an agency must also consider appropriate mitigation measures that would reduce the environmental impact of the proposed action. 42 U.S.C. § 4332(2)(C)(ii). As noted, our review is guided by whether the agency's analysis is reasonable and offers "sufficient detail to ensure that environmental consequences have been fairly evaluated." *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989)). "Perfunctory descriptions or mere lists of mitigation measures are insufficient." *Alaska Survival*, 705 F.3d at 1088. Rather, the agency must provide "an assessment of whether the proposed mitigation measures can be effective . . . [and] whether anticipated environmental impacts can be avoided." *S. Fork Band Council*, 588 F.3d at 727. Because mitigation measures are projections that allow an agency to alleviate "impact *after* construction," the EIS may not use them "as a proxy for [collecting] baseline data" *before* construction that would enable the agency to "first understand[] the extent of the problem." *N. Plains Res. Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067, 1084–86 (9th Cir. 2011). On the other hand, the EIS's proposed mitigation measures "need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp*., 222 F.3d 677, 681 n.4 (9th Cir. 2000).

In this case, the agency drafted a comprehensive set of mitigation measures relying, in part, on field studies conducted by Tule over several years in the proposed Project area. These studies, in combination with scientific research, informed the BLM's development of a number of mitigation measures, including the creation of the lengthy Protection Plan. The Protection Plan outlined additional methods of achieving environmental mitigation at each stage of the Project. The BLM incorporated the Protection Plan into the final EIS by reference.

Plaintiffs claim that the mitigation measures outlined in the EIS do not provide "sufficient detail," and that the EIS improperly defers the formulation of certain mitigation measures until post-development monitoring and inspection, notably through the use of an adaptive-management plan. Yet the mitigation measures, including the 85-page Protection Plan, provide ample detail and adequate baseline data for the agency to evaluate the overall environmental impact of the Project. Plaintiffs merely "fly speck" the EIS rather than identify consequential flaws that would prevent the agency from sufficiently grasping the Project's potential environmental consequences. *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987) (quotation marks omitted). Moreover, the EIS's inclusion of an adaptive-management plan, among other mitigation measures, provides flexibility in responding to environmental impacts through a regime of continued monitoring and inspection. That an agency decides to incorporate an adaptive management plan as one component of a comprehensive set of mitigation measures does not mean that the agency lacked a sufficient foundation of current baseline data from which to evaluate the Project's environmental effects. Rather, the use of such a continuous monitoring system may complement other mitigation

measures, and help to refine and improve the implementation of those measures as the Project progresses.

## D.  "Hard Look" at Environmental Impacts

Plaintiffs also raise a series of four substantive challenges to the BLM's investigation of the environmental impacts of the Project. As the district court correctly determined, each of these challenges is unavailing and, in some cases, would improperly compel a reviewing court to substitute its judgment for that of the agency. *See Lands Council*, 537 F.3d at 988.

### 1.  Avian Impacts

Plaintiffs assert two primary challenges to the EIS's analysis of the Project's avian impacts.  Plaintiffs contend that the EIS fails to comprehensively review the effects of Project-related noise on birds at all life stages, not just the nesting stage. Moreover, they claim that the agency failed to conduct nighttime migratory-bird surveys in the Project area to better estimate the numbers of such birds that might be struck by wind turbines. We conclude that the EIS's analysis of the likelihood of various bird species frequenting the Project area, as well as the potential impacts of the Project on bird populations, is reasonable and satisfies NEPA's "hard look" requirement.

First, the agency outlined over a dozen noise-mitigating measures that it determined would significantly reduce the environmental impacts of noise on birds to "low" or minimal levels. Because the BLM concluded that the Project's noise effects could be effectively reduced, it provided less analysis of noise effects in the EIS as compared to other more

significant or unmitigable environmental impacts. *See* 40 C.F.R. § 1502.2(b) ("Impacts shall be discussed in proportion to their significance. There shall only be brief discussion of other than significant issues."). Even though the agency could have included more detailed discussion of noise impacts or collected further information, its existing analysis did not impermissibly misconstrue the existing data or force the public and policymakers to speculate concerning projected environmental effects. *See Found. for N. Am. Wild Sheep v. U.S. Dep't of Agr.*, 681 F.2d 1172, 1179 (9th Cir. 1982). In addition, while the mitigation measures discussed in the EIS focus on the nesting and fledgling phases, the BLM reasonably deemed these life stages to be the most critical in bird development, and accordingly focused its analysis on those stages.[2]

Second, the agency's failure to conduct a nighttime migratory-bird survey was a discretionary judgment made by the agency on the basis of available scientific data. When the agency's determination is founded on reasonable inferences from scientific data, a reviewing court will not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the BLM relied upon existing surveys and scientific literature, which indicated that use of the Project area by nocturnal species would be low and that most nocturnal species would fly at altitudes higher than those of the

---

[2] Plaintiffs also contend that the noise levels from the Project would be incompatible with the use of the site by certain migratory songbirds, citing several scientific studies. However, the agency exercised its discretion in discounting the results of those scientific studies due, in part, to differences in the noise generated by the wind turbines and those at issue in the studies.

proposed turbines. This determination, too, was a reasonable exercise of the agency's discretion. Moreover, the BLM chose to reposition turbines in valleys rather than on top of ridgelines, which would lessen any risk to low-flying nocturnal migrants.

## 2.  Inaudible Noise

Plaintiffs contend that the EIS fails to adequately address the environmental effects of inaudible noise, including infrasound and low-frequency noise, on humans. In support of their contentions, Plaintiffs rely on a 2011 scientific study, which concludes that inaudible noise may have adverse effects on human health. The BLM considered this study in conjunction with an array of other scientific research literature, and ultimately concluded that inaudible noise generated by the Project would not cause discernable health impacts, based on a "consensus among acoustic experts." In particular, the BLM explicitly distinguished the results of the 2011 study in its responses to public comments on the EIS. *See Save the Peaks Coal. v. U.S. Forest Serv*., 669 F.3d 1025, 1037 n.5 (9th Cir. 2012). We defer to the agency's discretionary judgment with respect to the "evaluation of complex scientific data within the agency's technical expertise." *Envtl. Defense Ctr., Inc. v. EPA*, 344 F.3d 832, 869 (9th Cir. 2003). Plaintiffs have presented us with no reason to deviate from this rule or question the agency's well-considered conclusions here.

## 3.  Electromagnetic Fields and Stray Voltage

Similarly, Plaintiffs contend that the EIS fails to adequately examine the adverse health effects of electromagnetic fields and stray voltage that may be

generated by the Project. However, Plaintiffs' argument derives from an underlying substantive disagreement with the EIS's conclusions rather than a claim that the agency's methods of arriving at those conclusions are unreasonable. In reaching its conclusion, the BLM properly canvassed the available literature on electromagnetic fields and, in a reasonable exercise of its technical expertise, determined that any fields created by the Project did not present public health risks that would cause concern.

In addition, the BLM analyzed the risk of stray voltage and discussed appropriate mitigation efforts. Although the EIS acknowledges the risk of stray voltage on human health and safety, it reasonably discounted this risk in light of mitigation plans that would ground the turbines and provide for regular inspections to ensure their continued safety. Therefore, the EIS conforms with NEPA's requirement that the agency engage in reasoned analysis of environmental hazards, in proportion to their significance, to ensure that the public is adequately informed of a project's potential impacts. *See Churchill Cty.*, 276 F.3d at 1071.

### 4.  Greenhouse-Gas Emissions

The EIS also takes a "hard look" at the impact of the Project on greenhouse-gas emissions and global warming. The EIS analyzes projected emissions from the Project and concludes that these emissions, at 646 metric tons of carbon dioxide per year, fall below the level of significance required for further analysis under NEPA. In addition, the EIS states that "the project would create a renewable source of energy, thereby potentially decreasing overall emissions attributable to electrical generation in California." Contrary to Plaintiffs' contention, this passing projection of potential emissions

reductions, simply by virtue of the Project's creation of a new source of renewable energy, is reasonable enough and does not mandate the provision of conclusive proof through additional evidence and analysis beyond that already provided in the EIS.

Finally, Plaintiffs contend that the BLM failed to take into account the emissions generated by the manufacture and transportation of equipment to the Project area. Instead, the BLM reasoned that these emissions levels were largely outside the control of Tule and that attempts to estimate these amounts would be overly speculative. The BLM was entitled to choose among various reasonable methodologies, as it did here, when estimating the emissions generated by the Project. *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012).

## II. Liability under the MBTA and Eagle Act

Plaintiffs raise the novel argument that the BLM—by the mere act of granting Tule's right-of-way request—is complicit in future conduct by Tule that might result in violations of the MBTA and the Eagle Act (collectively, the Acts). Plaintiffs' theory of liability is two-fold. First, Plaintiffs assert that the BLM, acting in its regulatory capacity, is directly liable for the unlawful "take" of birds under the Acts, absent a permit from the FWS. Second, Plaintiffs assert that the agency's regulatory authorization is "not in accordance with law" within the meaning of the APA, 5 U.S.C. § 706(2)(A), because the BLM did not condition its right-of-way grant on Tule securing the appropriate permits from the FWS. We address each of these arguments in turn.

### A.  The Migratory Bird Treaty Act

The MBTA is a criminal statute that prohibits an individual, entity—or, in some cases, an agency—"at any time, by any means or in any manner, to pursue, hunt, take, capture [or] kill . . . any migratory bird, . . . nest, or egg of any such bird" in the absence of a permit or other exemption. 16 U.S.C. § 703(a). The FWS is the federal agency tasked with ensuring compliance with the MBTA, including issuing permits and prosecuting offenders. *See id*. §§ 706, 707(a), (d). Through the APA's prohibition against unlawful agency action, a plaintiff may bring a civil suit to compel agency compliance with the MBTA. *See City of Sausalito*, 386 F.3d at 1203.

### 1.  Liability under the MBTA

As more fully discussed, *infra* Section II.A.2, we hold that Plaintiffs' argument that the Project will inevitably result in migratory-bird fatalities, even if true, is unavailing because the MBTA does not contemplate attenuated secondary liability on agencies like the BLM that act in a purely regulatory capacity, and whose regulatory acts do not directly or proximately cause the "take" of migratory birds, within the meaning of 16 U.S.C. § 703(a). Here, the BLM only authorized Tule to construct and operate a wind energy facility on public lands, and therefore did not act to "take" migratory birds without a permit, within the meaning of the MBTA.

The authorities Plaintiffs cite in support of its argument are distinguishable. In *Humane Soc'y of the United States v. Glickman*, 217 F.3d 882 (D.C. Cir. 2000), the U.S. Department of Agriculture, in conjunction with state

agencies, was responsible for instituting a plan that would intentionally capture and kill migratory geese. *Id.* at 884. In that case, the agency itself was implicated in the killing of migratory birds without a permit, in violation of the MBTA.

Similarly, Plaintiffs point to special legislation exempting the Department of Defense from the MBTA's prohibition against the incidental take of migratory birds in the course of its military readiness exercises. *See National Defense Authorization Act for Fiscal Year 2003*, P.L. 107-314, 116 Stat. 2458 § 315 (2002). Such legislation merely proves the point, established in *Glickman*, that agencies may be held liable for violations of the MBTA when they *themselves* engage in the taking of protected birds. However, such actions are far removed from purely regulatory action that does not constitute, or even proximately cause, an unlawful "take" under the MBTA. Instead, the BLM's decision to grant Tule's right-of-way request was many steps removed in the causal chain from the potential commission of an unlawful "take" caused by wind-turbine collisions.

Finally, Plaintiffs refer us to the recent actions of the National Marine Fisheries Service (NMFS), which applied for a permit from the FWS to cover the incidental take of migratory seabirds by a Hawaii longline fishery. Under one interpretation of that scenario, the NMFS could be said to function in a managerial capacity over the activities of the fishery. *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 2013 WL 4511314, at * 6 (D. Haw. 2013). If so, then NMFS would occupy a more directly supervisorial position over a regulated third party than that of a typical agency, and certainly that of the BLM vis-à-vis Tule. Moreover, looking at the NMFS permit application from another angle, the fact that one agency may choose to apply

for a permit from the FWS to further shield itself from the risk of potential liability does not compel all agencies acting in a regulatory capacity to do the same. Rather, as the FWS has concluded, "the agencies themselves are not subject to the prohibitions of the MBTA when acting in their regulatory capacities," and thus are generally not required to seek a permit to cover the separate actions of "third parties regulated by those agencies." Migratory Bird Permits; Programmatic Environmental Impact Statement, 80 Fed. Reg. 30,035 (May 26, 2015).

### 2.  Liability under the APA

Alternatively, Plaintiffs argue that the BLM's right-of-way grant is "contrary to law" within the meaning of the APA because it permits Tule to engage in otherwise lawful activities that would incidentally lead to migratory-bird deaths—a final result that is contrary to the MBTA. Plaintiffs maintain that, even if the BLM is not *directly* liable under the MBTA, the agency is compelled to deny the right-of-way request unless Tule first obtains a permit for the incidental take of migratory birds. To do otherwise, Plaintiffs contend, would render the BLM complicit in the unlawful actions of a third party, and in violation of the APA. However, the BLM's regulatory role in this case is too far removed from the ultimate legal violation to be independently unlawful under the APA.

Plaintiffs' claim, which verges on argument for unbounded agency vicarious liability, relies on a selective characterization of the agency action at issue and fails for reasons similar to those discussed above. The BLM, by the mere act of granting Tule a right-of-way, has not behaved in an unlawful manner under the APA. Rather, Plaintiffs'

argument hinges on the assumption that a third-party grantee like Tule, in its operation of the wind turbines, will behave in an unlawful manner under the MBTA. Based on this assumption, Plaintiffs would impose an affirmative duty on the BLM to guarantee Tule's future compliance with the MBTA by ensuring that Tule first secure a permit. To what extent does the BLM have a duty under the APA to take affirmative measures to prevent potential unlawful action by Tule? Our concerns of agency complicity in the instant case are substantially allayed by several considerations.

First, as discussed above, the APA does not target regulatory action by the BLM that permits a third-party grantee like Tule to engage in otherwise lawful behavior, and only incidentally leads to subsequent unlawful action by that third party. *See supra* Section II.A.1. The causal mechanism in question is too speculative and indirect to impose liability on the BLM for engaging in routine regulatory action. Here, the BLM's right-of-way did not sanction or authorize the taking of migratory birds without a permit; it authorized the development of a wind-energy facility. Without further indication of its involvement in the putative violation, we cannot hold the BLM complicit in future unlawful activity, separately committed by a grantee, through a mere failure to intervene at the permitting stage.

Moreover, the BLM has not sanctioned or encouraged an unlawful course of action by Tule. Rather, it has done the opposite. The BLM's ROD indicates that its approval of the Project is expressly contingent on Tule's compliance with "all applicable laws and regulations," which in this case includes the MBTA and the Eagle Act, as well as the securing of "all necessary local, state, and Federal permits, authorizations, and approvals." The terms of the ROD further permit the

BLM to, at any time, withdraw its right-of-way approval if it determines that Tule has failed to comply with these provisions.

In contrast, in several cases implicating other environmental-protection laws, the agencies in question acted unlawfully because they improperly exercised their regulatory authority to sanction conduct by third parties that was itself unlawful. In *Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004), for example, the agency permitted the unlawful hunting of whales by an Indian tribe as a result of a legally erroneous interpretation of a tribal treaty and in violation of the Marine Mammal Protection Act. *Id*. at 480, 486 (explaining that the agency environmental assessment unlawfully authorized "a quota for the 'land[ing]' of five gray whales").

Similarly, in *Wilderness Society v. U.S. Fish & Wildlife Service*, 353 F.3d 1051 (9th Cir. 2003) (en banc), the FWS issued a permit allowing a third party to operate a "commercial enterprise" in a national wilderness area, based on a legally mistaken construction of the governing federal statute, which prohibited such commercial activities. *Id*. at 1055. Here, in contrast, the BLM has not misconstrued the requirements of the MBTA; nor has it encouraged or ratified unlawful acts taken by third parties in violation of the MBTA.

Plaintiffs' reliance on *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101 (9th Cir. 2012) is also inapposite. That case involved the BLM's compliance with the Endangered Species Act, a federal statute that reaches farther than the MBTA in that it explicitly requires an agency to engage in interagency consultations that will "[e]nsure that any action authorized, funded, or carried out by such agency. . . is not likely to jeopardize the continued existence

of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). No such provision is included in the MBTA, or the Eagle Act, which might otherwise create an analogous affirmative duty on the part of the BLM to guarantee a grantee's compliance with the Acts.

## B.  The Bald and Golden Eagle Protection Act

Similar to the MBTA, the Eagle Act provides that, absent a permit or other exemption, it is unlawful to "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle, common known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof." 16 U.S.C. § 668(b). The FWS also administers the Eagle Act, including overseeing the issuance of permits and ensuring compliance with the statute. Unlike the MBTA, the Eagle Act explicitly provides for both criminal and civil enforcement. *Id*. § 668(a)–(b).

Despite some substantive differences between the MBTA and the Eagle Act, the same reasoning applies to defeat the imposition of liability on the BLM here. *See supra* Section II.A. Further support for this conclusion is provided by a FWS regulation that pertains to permits for the "incidental take" of eagles. 50 C.F.R. § 22.26; *see* Eagle Permits; Take Necessary To Protect Interests in Particular Localities, 74 Fed. Reg. 46,836 (Sep. 11, 2009). There, the FWS explained that "[p]ersons and organizations that obtain licenses, permits, grants, or other such services from government agencies are responsible for their own compliance with the Eagle Act and should individually seek permits." 74 Fed. Reg. 44,843 (Sep. 11, 2009). It further explained, however, that "agencies must obtain permits for

take that would result from agency actions that are implemented by the agency itself (including staff and contractors responsible for carrying out those actions on behalf of the agency)." *Id*. We hold, in the narrow circumstances of this case, that the BLM did not, by granting Tule the referenced right-of-way, take "agency actions . . . implemented by the agency itself" that would directly or proximately result in the incidental take of eagles by it or Tule.

As a result, a requirement that the BLM independently seek a permit, or confirm that grantees seek permits before issuing a right-of-way grant, would impose an attenuated form of secondary liability on the BLM, an agency that is neither statutorily tasked with policing third-party compliance with the Eagle Act nor responsible for violations that might be independently committed by grantees, such as Tule.[3]

## CONCLUSION

We hold that the BLM is not liable under NEPA, the MBTA, the Eagle Act, nor the APA for its regulatory decision to grant Tule a right-of-way to develop and operate a renewable wind energy project. The judgment of the district court is **AFFIRMED.**

---

[3] We note that even if the BLM were responsible for policing third-party compliance with the Eagle Act, the Protection Plan, devised in conjunction with the FWS, reasonably determined that the Project could "practicably be modified to avoid the take." 50 C.F.R. § 22.26 (e)(1).